The State of Ohio, Appellee, v. George, Appellant.

[Cite as State v. George (1975), 50 Ohio App. 2d 297.]

(No. 75AP-110—Decided September 18, 1975.)

*Mr. George C. Smith,* prosecuting attorney, *Mr. George C. Rogers* and *Mr. Frank A. Ray,* for appellee.

*Messrs. Fontana, Ward, Kaps & Perry, Mr. William J. Melvin, Mr. Walter C. Boyuk,* and *Messrs. Nelson, Hager & Pancake,* for appellant.

Holmes, J. This matter involves the appeal of a judgment of the Common Pleas Court of Franklin County wherein the trial court, construing the term "security" as contained in R. C. 1707.01, and as defined further by this court, found the defendant guilty upon two counts of violating R. C. 1707.44(C) of the securities act, which requires the registration of certain securities.

The facts in brief upon which the trial court entered its judgment, and upon which the defendant now appeals herein are all basically stipulated to be as as follows. Mr. James Worley and Mr. Clifford Howard became interested in acquiring so-called distributorships involving the finishing of eight-track cassette tapes, and selling them back to the supplier-manufacturer, known as Bonanza Productions Company, of which defendant Emil R. George was vice president.

Bonanza Productions, under such arrangement, was to supply to the investor-distributor all of the necessary tapes, cassettes, etc., for the finishing of eight-track cassette packages for sale back to Bonanza Productions. The latter was, according to the contract, to be responsible for providing the distributor with all of the pre-recorded tape which went into the eight-track cassettes, and the distributor was to take the uncut reel of tapes and prepare such for sale back to the company in the form of 1,000 tapes per week. Bonanza Productions was to assume the sole responsibility for marketing the distributor's manufactured tapes, and was to pay the distributor for such tapes.

Mr. Worley and Mr. Howard, after negotiations with a representative of Bonanza Productions, entered into an agreement entitled "Purchase Order and/or Manufacturing Agreement" on November 23, 1972. Mr. Howard signed as the listed purchaser of one of the so-called distributorships, and Mr. Worley as the purchaser of the other so-called distributorship.

Three checks, two in the amount of $3,000 and one in the amount of $4,000, were made payable to Bonanza Productions Company in partial payment of the purchase price of such contracts on behalf of Mr. Howard and Mr. Worley. The checks were endorsed for purposes of payment on behalf of the Bonanza Productions Company by Mr. Emil R. George, signing as vice president of Bonanza. It was stipulated that there had been no registration of securities by Bonanza.

Upon these facts, the trial court applied the law set forth in this court's decision in *Peltier* v. *Koscot Inter-*

*planetary, Inc.*, unreported, No. 72AP-220, rendered November 14, 1972, wherein this court adopted the rather broad four-point test found in *State of Hawaii* v. *Hawaii Market Center* (1971), 52 Haw. 642, 485 P. 2d 105, for the determination of what type of transaction might constitute an "investment contract."

The defendant appeals, setting forth a two-pronged approach to his assignments of error. Assignment of error one reads as follows:

"Judicial enlargement of a criminal statute by interpretation applied retroactively to subject a person to criminal liability for past conduct constitutes a violation of such person's right to due process of law under the Fourteenth Amendment of the United States Constitution."

Assignment of error two states:

"The trial court erred in holding a contract for the purchase of equipment to produce eight track stereo tapes, together with the right to sell the tapes produced under seller's label at wholesale, retail, or at purchaser's election, to sell a finished product back to the seller of the equipment, is a security."

Stated succinctly, in reverse order, the assignments of error maintain that the transactions between the parties do not constitute the sale of a "security," and even though it should be determined to be such, the trial court's application of the broader definition of a term previously judicially construed, and in general used throughout the state and this district, may not be applied unfairly to him in a criminal proceeding so as not to provide him adequate notice of that which the law proscribes.

## I.

The definition section which has given rise to this discussion is R. C. 1707.01, which in pertinent part reads as follows:

"1707.01 Definitions.

"As used in sections 1707.01 to 1707.45, inclusive, of the Revised Code:

"(B) 'Security' means any certificate or instrument which represents title to or interest in, or is secured by any

lien or charge upon, the capital, assets, profits, property, or credit of any person or of any public or governmental body, subdivision, or agency. It includes shares of stock, certificates for shares of stock, voting-trust certificates, warrants and options to purchase securities, subscription rights, interim receipts, interim certificates, promissory notes, all forms of commercial paper, evidences of indebtedness, bonds, debentures, land trust certificates, fee certificates, leasehold certificates, syndicate certificates, endowment certificates, certificates or written instruments in or under profit-sharing or participation agreements or in or under oil, gas or mining leases, or certificates or written instruments of any interest in or under the same, receipts evidencing preorganization or reorganization subscriptions, preorganization certificates, reorganization certificates, certificates evidencing an interest in any trust or pretended trust, any investment contract, any instrument evidencing a promise or an agreement to pay money, warehouse receipts for intoxicating liquor, and the currency of any government other than those of the United States and the Dominion of Canada but such sections shall not apply to bond investment companies or to sale of real estate. * * *''

An early judicial review and determination of what construction would be given the term ''security'' is found in the case of *Groby* v. *State* (1924), 109 Ohio St. 543, where the court was confronted with the question of whether membership receipts in an oil syndicate were in fact securities. The court had no trouble in finding that, under the definition section of the securities code, the membership receipts constituted a security. It was noted that such receipts stated upon their face that the subscriber would be entitled to a pro rata interest in all earnings and profits of the syndicate.

The court then went on to state, at page 547: ''It therefore clearly appears that, if the Citizens' Syndicate had or should have any property from which there could be any profits or earnings of any sort, then the instrument in question was an evidence of title or interest in property.'' The underlying test here is the determination that profits and

earnings are anticipated from the property of the syndicate.

Another major case in this field in Ohio that had for a number of years been cited and relied upon as authority in the determination of what constitutes an "investment contract" is *State* v. *Silberberg* (1956), 166 Ohio St. 101, where the court, in reviewing the conviction of the defendant for selling unregistered securities, held in paragraph one of the syllabus:

"In determining whether an interest is an investment contract or an interest in a real estate transaction, the principal test is the individual control which the purchaser has over the property or business venture in which he has acquired the interest. If the purchaser is to share in the gross proceeds or net profits of operations managed by the one who is disposing of the interest, the instrument evidencing the interest transferred is generally considered as an investment contract; but, if the purchaser of real property with others is to occupy the premises and conduct the enterprise, the instrument evidencing the interest is generally not an investment contract or security."

Here, again, the court turned its attention to the motivation for the investment, and found a profit-making motive. The court set forth the language of the Court of Appeals, at page 107 of the decision, as follows:

"Neither the evidence of the parties involved nor the contract itself shows any plan or scheme to invest in a profit-sharing venture. * * *

"The purpose of an investment in a security is the hope of receiving an income as a return on such investment. There is nothing revealed by the record in these cases that shows such intent or purpose."

A later case in Ohio, that of *Emery* v. *So-Soft of Ohio* (1964), 94 Ohio Law Abs. 357, involved a review of "referral agreements" and whether such constituted securities. The court, in finding that the involved agreements were not securities, applied the more limited test as had earlier been announced in the case of *Securities & Exchange Commn.* v. *W. J. Howey Co.* (1946), 328 U. S. 293.

*Emery,* at page 366, states as follows:

"* * * [T]o establish that an instrument or certificate is a security, it must be shown that such instrument or certificate represents an investment in a designated portion of the assets and capital of a concern with the hope of receiving a profit solely through the efforts of persons other than the investor. * * *"

Our attention is directed to the language which provides that profits be forthcoming *solely* through the efforts of persons other than the investor. This court, in *Koscot,* did not adopt the more limited test of *Howey,* but instead recognized the current necessities of the business world, and the basic purpose of the enactment of the securities laws, and concluded that there were more reasonable, modern and practicable tests for the judicial determination of whether the facts and circumstances of a certain offering, scheme, or operation constitute a "security" under the statutes. Further, it was felt that a more modern test could be adopted which would not be contrary to the law as previously pronounced by our Supreme Court in this area of concern, but would be a redefining or broadening of such prior holdings.

In *Koscot,* this court adopted the test set forth in *Hawaii Market Center, supra,* and we hereby reaffirm our position that such test is a reasonably sound one both from the standpoint of providing a pattern within which to compare the format, structure and scheme of the offering, and also providing the requisite flexibility demanded by the economic realities of modern day business ingenuity.

The Supreme Court of Hawaii, in *Hawaii Market Center, supra,* held in paragraph five of the syllabus that there is an "investment contract," and thence a "security," when "(1) an offeree furnishes initial value to an offeror, and (2) a portion of this initial value is subjected to the risks of the enterprise, and (3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation

of the enterprise, and (4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.''

Although in the instant case the negotiations between the parties, the instruments of agreement, and the conduct required of the parties might concededly be a bit more subtle, and less interplanetary, than that found in *Koscot,* we must still hold that within the intent and purpose of the securities statutes such transaction resulted in a sale of an ''investment contract'' type security by this defendant.

The first element of the test set forth in *Koscot* is that the offeree furnish initial value to the offeror. We hold that the first element, on the face of the record, has been met.

The second element provides that the contribution of the initial value must be subjected to the risks of the venture or enterprise. The question to be answered here is whether it appears that the contributed sums would reasonably find their way into the general operations of the enterprise. Stated another way, it is whether such investment would become a part of the capital pool used to conduct the business being promoted by the offeror. If so, such initial value furnished by the offeree may be considered as risk capital of the enterprise.

Upon a review of the record we conclude that the various elements into which the initial investment was advanced by the offeree, a number of them, such as the ''bookkeeping-licensing and royalty payments,'' ''advertising-sales management,'' and ''complete training-installation and training of personnel,'' may reasonably be considered as being within the broad general area of operational functions of the conduct of this enterprise. The offeree's funds, or investment, were in fact being used by the offeror in the operation and conduct of the business. The second element of the test is therefore met.

We believe the query as to the third element relating to the profit motive of the venture, both as to the offeror and as to offeree here, is self-answering. We hold that, clearly, the inducement to place money in this enterprise was the

offered opportunity to make a profit beyond the initial out-lay of funds by these offerees. It might well be true that facts in a given case may satisfy all of the above elements, but the venture, enterprise, or offering would still not be considered an "investment contract" type security. All of the above elements could conceivably be present in a distributorship, manufacturer's representative agreement, franchise, or other commercial arrangement. However, when we come to the fourth element set forth in *Hawaii Market Center* and adopted by this court in *Koscot,* the application of such element to the facts of the given case may considerably alter the determination. The test relates to the right of the offeree to exercise practical and actual control over the managerial decisions of the enterprise. If the offeree has such a right within the subject enterprise, as set forth within the operating agreement or otherwise, then a "security" would not be present in that, in the traditional form of securities, there is an absence of direct control over the investment by the investor.

Conversely, where the facts show that the offeree has little or no right to exercise a substantial degree of control over the enterprise into which he has contributed his initial value, then a "security" can well be found by the court.

Here the facts show that, by the terms of the agreement, the offeree enjoyed no meaningful managerial control over the enterprise. In paragraph one, the distributor is told that he "*will* follow authorized techniques and guidelines" of the Bonanza Productions. He is not offered flexibility within this clause, but is subjected to the managerial directives of the company. In paragraph two, the distributor is again given no choice as to his method of operation. He "*must* purchase all materials" from the company or suffer loss of his distributorship. In paragraph four of the agreement, Bonanza "agrees to arrange for the sale, or to purchase" a designated number of tapes per week. Herein, the managerial control of the most important facet of the enterprise—the marketing of the product—is the responsibility of the company. The trend of complete assumption of managerial control continues within the company, as it

agrees "to provide all the necessary materials" for assembling the tape cartridges in paragraph five. Similarly, paragraph six leaves the method of shipping to the company's discretion, and paragraph seven assigns the company all training duties and responsibility for supplying the tape-winding equipment to the distributor.

In essence, hardly a thing is left to the Bonanza distributor's imagination or control. His only duty is to wind eight-track tapes per Bonanza's instructions. Surely, this menial task, when compared to the responsibilities of Bonanza, does not involve a distributor with "the right to exercise practical and actual control over the managerial decisions of the enterprise." We find that, based upon all of the facts contained in the record, element number four set forth in *Hawaii Market Center* and *Koscot, supra,* is satisfied. Accordingly, we must hold that the trial court did not err in holding that the transaction here constituted the issuance and sale of a security, and that such sale and issuance were in violation of the statutes of Ohio provided therefor.

## II.

In his first assignment of error, the defendant presents a series of interesting issues, one of which has been the subject of legal decisions, and law review articles, for a number of years. First, defendant argues that this court, in *Koscot, supra,* changed and broadened the legal definition of "security" or "investment contract," as defined in R. C. 1707.01. The defendant further argues in this regard that the decisional change of the law was unconstitutional as to him, as it had an *ex post facto*, or retroactive, effect upon him contrary to the due process clause of the Constitution of the United States.

Additionally, the defendant argues that, even though such legal decision might not be considered *"ex post facto,"* he did not have fair notice of the "expanded definition" of this court as to what might consitute a "security." Defendant, in this latter regard, inferentially argues that he could not have been given notice of such decisional law

in that the *Koscot* decision was not officially reported, pursuant to the provisions of R. C. 2503.20.

As to the first claim under this assignment of error, to the effect that the decisional law in *Koscot,* which the trial court cited, and upon which the trial court relied, applied retroactively as to defendant, we acknowledge the legal proposition that, generally, decisional law, in the same manner as statutory enactments, must act prospectively and not retroactively. *Bouie* v. *City of Columbia* (1964), 378 U. S. 347. However, it merely need be stated for purposes of the facts of the instant case that the decision in *Koscot* was rendered on November 14, 1972, and the act of selling the unregistered securities with which defendant was charged and convicted took place on November 23, 1972. Therefore, in light of such facts, there is no element of an *ex post facto* law by way of a prior decision of this court.

Even though the ruling in our prior decision was not *ex post facto* in nature, as to the defendant, we must recognize that this court's interpretation in *Koscot* of what might constitute a "security" was in effect a broadening of what the courts in this state had previously considered to fall within the term of "security" under the Ohio securities act.

Therefore, the defendant's general proposition, that a review must be made by this court as to whether defendant was afforded fair notice of the interpretation is well taken. However, at the outset of this discussion we point out that the claim that due process of law was denied may not be premised upon the fact that a prior decision of this court relied upon by the trial court, had not been officially published pursuant to law.

It is true that in accordance with Section 6, Article IV of the Ohio Constitution, which, prior to 1968, provided that laws may be passed providing for the reporting of cases in the courts of appeals, the General Assembly has enacted laws relating to the reporting of cases from such courts. The earlier section of law which provided for the reporting of decisions of the courts of appeals was G. C. 1483, which in pertinent part provided that the Supreme Court reporter

"shall also prepare for publication and edit, tabulate and index such opinions and decisions of any court of appeals as any such court may designate and furnish him for publication * * * . Opinions for permanent publication in book form shall be furnished to the reporter of the Supreme Court and to no other person. Only such cases as are hereinafter reported in accordance with the provisions of this section shall be recognized by and receive the official sanction of any court within the state."

The present section providing for the publication of the decisions of courts of appeals is R. C. 2503.20, which states, in pertinent part:

"[The Supreme Court reporter] shall prepare for publication and edit, tabulate, and index those opinions and decisions of any court of appeals furnished him for publication by any such court * * *. Opinions for permanent publication in book form shall be furnished to the reporter and to no other person. After August 15, 1919, all such cases must be reported in accordance with this section before they shall be recognized by and receive the official sanction of any court."

The original statutory enactments were necessitated because of the duplicity of reporting systems that were engaged in selectively reporting decisions of Courts of Appeals. It was desirable to have, as in the instance of the reports of the Supreme Court of Ohio, one official reporting system. Other than the salutary result of cutting the number of books to be acquired by those in the profession, the requirement that opinions be officially reported before they receive judicial recognition has another valid basis. It is fundamental that if a decision is cited as authority and precedent such should be readily obtainable by all parties and by the court. Further, as applicable to this case, where a court's decision has changed or modified the existing interpretation of a law, citizens who may be affected by such change should be given the opportunity to be apprised of such change.

Obviously, another valid reason for the official reporting of decisions from the various courts of appeals through-

out the state is to provide information regarding the decisional law being applied in each judicial district, and to effect a more uniform construction and application of the laws throughout the state.

There have developed over the years considerable differences of opinion as to the import of the language of R. C. 2503.20. Some judicial decisions and legal authorities have adhered to the belief that the language relating to the prohibition against the recognition of an unreported decision is mandatory in nature. Other authorities have taken the position that such is directory only.

R. C. 2503.20 has been relied upon by the Court of Appeals for Mahoning County as the basis for denying a motion to certify the record where there was claimed to be a conflict with an unreported case. We find the following, at paragraph three of the syllabus, in *Bevan* v. *Century Realty Co.* (1940), 64 Ohio App. 58:

"Certification of a judgment of a Court of Appeals, as being in conflict with the judgment of another Court of Appeals, will be refused, when nothing is presented except an unofficially reported opinion of the other court, and the authors of such opinion have failed to follow the Supreme Court of Ohio."

Following *Bevan*, the Court of Appeals for Franklin County, one member of the court dissenting, denied a motion to certify on the basis of conflict because the decision of the other court had not been reported. The court in *National Surety Corp.* v . *Blackburn* (1951), 62 Ohio Law Abs. 158, said, at page 159:

"A further reason for denying the motion is that under the concluding sentence of §1483 GC recognition and sanction are not to be accorded to unofficially reported opinions."

As to whether the Supreme Court of Ohio considers its unreported decisions as authority, we find the following of interest in 14 Ohio Jurisprudence 2d 641, Courts, Section 208:

"Ordinarily, the Supreme Court does not regard its unreported cases as judicial authority, for the reason that it is generally impossible to ascertain the concrete legal

propositions involved and decided; but where a single question is involved, and that is distinctly stated and decided, it cannot be said that such unreported case is wholly without influence." Citing the case of *Bumiller* v. *Walker* (1917), 95 Ohio St. 344.

It is interesting in this regard to note that in the case of *Gustin* v. *Sun Life Assur. Co.* (C. A. 6, 1946), 154 F. 2d 961, Judge Allen, formerly of the Ohio Supreme Court, pointed out that G. C. 1483 [now R. C. 2503.20], if mandatory, required that unreported opinions not be recognized by Ohio courts, and that such provision applied to both Supreme Court and Courts of Appeals decisions. The judge further commented that such provision had been for the most part unenforced in the courts of Ohio, evidently being regarded as directory, rather than mandatory. Judge Allen pointed out that the official reports of the Supreme Court of Ohio over the years had in fact cited unreported cases from lower courts, and that the Supreme Court itself had recognized and ostensibly given sanction to its own unreported cases.

It seems to be a well established general rule that what a given court has stated in the past on a subject is important to the litigants, as well as to the court. In this regard, legal precedents provide a guiding principle in the presenting and arguing of cases, as well as in their decisions. We believe this to be so whether or not a previously announced position concerning the law is contained in an officially reported case.

The place of precedents in our system of law has been set forth in 14 Ohio Jurisprudence 2d 637, Courts, Section 204:

"The doctrine of precedents, which is invoked in determining the law applicable to a given case, owes its origin and observance to a recognition of the necessity for stability and uniformity in the construction and interpretation of the law. A rule of law once announced by the court should be followed until, by the opinion of at least a majority of the court, the rule has been or should be changed. * * *"

However, as a matter of practice, a court of appeals,

or any panel of judges sitting therein, is not unalterably bound to follow the precedent of a rule previously announced or followed by such court, whether published or unpublished. However, the orderly conduct of the judicial affairs of such court would call for the reasonable application of that which has previously been pronounced as being the law of the district in similar cases. Until a proper reason for change has been advanced and adopted, the court, as well as the individual members thereof, should temper their own inclinations as to the law and apply legal precedents where applicable. We feel that the latter proposition pertains whether the law to be applied to the matter before the court is contained in a prior officially published decision of the court, or one not so published.

It is our view that the reason, or requirement for the necessity of applying a strict mandatory approach to the official reporting of decisions diminishes, to a degree, where districts have established procedures by which their own decisions are being given a reasonably wide unofficial publication and distribution. In this district, it had been the practice for a good many years to provide a copy of all decisions to the law library, as well as to counsel for the parties. Starting in 1967, the decisions were bound quarterly, and indexed by case style, with copies made available to the court. Beginning in 1969, copies of the decisions in all cases were distributed to counsel for the parties, and to the Supreme Court Reporter, Supreme Court law library, Municipal Court, Common Pleas Court, county law library, clerk of courts, defense lawyers' association, trial lawyers' association, county prosecutor, police department's legal bureau, the news media, and the legal aid and defender society.

Further, since 1969, at the end of each quarter, all of the decisions of this court are bound and indexed by subject matter and by section of law or rule of practice involved. Copies of such volumes are available in the court, and copies are made available to any law office or practicing attorney who desires them for only the cost of their printing. It has been the practice of this court for some years to

cite its own prior unreported decisions, which it is felt is the law applicable in similar matters before this court, where such is unchanged by a decision of the Supreme Court. The judges of this court do not arbitrarily follow such precedents, but each gives due respect to the law as previously announced concerning the general subject matter.

In like manner, the trial courts in this district have traditionally looked to the law previously pronounced by this court, whether the decisions were officially published, or appear in unreported form, and such courts have cited and relied upon these decisions where such remain unchanged by a decision of the Supreme Court of Ohio, or this Court of Appeals. Also, counsel, in their briefs submitted to the trial court as well as to this court, refer to and cite unreported cases of this court as authority. Such has been true whether counsel is representing an individual, is an assistant attorney general representing the state of Ohio, or is an assistant prosecuting attorney representing the county or one of its officials.

Whether or not the pronouncements of the court in *National Surety Corp.* v. *Blackburn, supra,* should still be applicable today is not squarely before us, in that this is not a conflict case. However, we do not agree with the broad statement set forth in that case, as quoted. We believe the more reasonable approach is that which is currently being followed in this district. We approve of this practice, and feel that the ability to rely upon prior legal pronouncements of this court is helpful to us, and to the trial court, as well as to counsel, giving a certain stability to the established law where such is still appropriate, and in the end resulting in the rendering of a higher standard of justice.

It is our view that a more modern and uniform system of decision writing and reporting needs to be effected in the Courts of Appeals of Ohio, but until such time as this might be accomplished, we shall continue to view the statute in question here as being directory, rather than mandatory.

We note that an author of a certain law journal article on this subject seems to agree with this conclusion. In the

article *The Unofficially Reported Case as Authority,* 1 Ohio St. L. J. 135, 137, we find:

"The problem of what to do with unofficially reported cases, however, should be viewed not alone from the lawyer's standpoint. From the point of view of the judges it merits serious consideration. Fundamentally it involves the doctrine of precedent, which is not a matter of judicial whim, but is an integral part of our judicial technique. We insist that the decisions of our courts be uniform; that, in the main, we shall be able to foretell the outcome of a given case by the decision or a similar set of facts in a former case before the same court. * * *

"However it would appear (1) that the intended effect of the amended Section 1483 General Code is, that the official reports should be the only set of bound appellate court reports; (2) that this statute is not meant to modify whatever place precedent has in the deciding of cases; and (3) that some arrangement of filing and digesting appellate court decisions should be established in each of the nine appellate districts and that they should be readily accessible to the average attorney."

Accordingly, we conclude that the prior unreported cases of this district may be cited by this court, and be relied upon as authority and precedent by the trial courts and by counsel in this district. Therefore, we reject the argument that this defendant did not have fair notice of the pronouncements of *Koscot* merely because the decision was not officially published.

However, as stated, the acts for which this defendant was convicted took place only six days after the rendering of the *Koscot* decision, and we are moved to find that it is a reasonable assumption, in the absence of a showing to the contrary, that the defendant or, perhaps, even his counsel was not aware of such broadened definition of what constitutes a "security" or "investment contract." In such an instance, we believe that the principles of due process would dictate our finding that this defendant had not in fact been given fair notice of the status of the law that he was bound to follow. Based upon this latter reason, the

first assignment of error is hereby sustained. Accordingly, the judgment of the Court of Common Pleas of Franklin County is hereby reversed, and the defendant is discharged from the effects thereof.

*Judgment reversed.*

STRAUSBAUGH, P. J., and REILLY, J., concur.