This case is before us on the appeal of James Roddy, Daniel Brown, and Richard Lawson (Plaintiffs) from a trial court order dismissing their complaint against various parties, including mortgage lenders, title agencies, brokers, sellers of real estate, and other defendants. The Plaintiffs' complaint arose from a series of real estate transactions that took place in 1999. Essentially what occurred is that Defendant, Theran Alexander, persuaded Plaintiffs to sign promissory notes to buy various parcels of real estate. Alexander allegedly told Plaintiffs that they would pay no money down for the properties and would receive $3,000 shortly after closing, plus reimbursement for closing costs. Alexander would then manage the properties, collect rent, and remit about 90% of the rent to Plaintiffs.
Based on the promissory notes, various lenders advanced funds for the purchase of about 41 different parcels of property in Ohio and West Virginia. Alexander also told Plaintiffs that a land sale contract would be arranged with the tenant of each property. After a year of rent was received, the property would then be sold to the tenant at the market price and refinanced. What Alexander did not tell Plaintiffs was that the sale price for each parcel was much higher than the property's actual value. The sale price also substantially exceeded what the sellers were being paid. After the closings, Alexander did not give Plaintiffs the promised money. Instead, he fled to Mexico. Plaintiffs were then left with property they had purchased at above market value, outstanding mortgages, and in some cases, no tenants. Accordingly, Plaintiffs brought a complaint for recission against Alexander, his companies (Therax Investments, Inc., and GPA Investments, Inc.), and various sellers, brokers, lenders, title agencies, and appraisers. In the complaint, Plaintiffs claimed that the real estate sales should be rescinded because they violated R.C. Chap. 1707.
The primary question below was whether the real estate sales were "securities" as that term is defined in R.C. 1707.01(B). After asking the parties to brief this point, the trial court found that the sales were not securities, and that the complaint failed to state a claim. On appeal, Plaintiffs assert the following single assignment of error:
 1. The trial court erred by applying an overly restrictive, unduly narrow standard in determining that Plaintiffs-Appellants' interests were not "securities," as defined by the Ohio Revised Code, but rather were naked sales of real estate.
After considering the assignment of error, we find it without merit and affirm the judgment of the trial court. An explanation of our decision follows.
 I
As we mentioned, the trial court dismissed the complaint for failure to state a claim. We review such decisions de novo. Shell v. Crain's Run Water and Sewer Dist. (Jan 21, 2000), Montgomery App. No. 17961, unreported, 2000 WL 43713, p. 1. Further, in construing a complaint on a motion to dismiss, we "presume that all factual allegations of the complaint are true and make all reasonable inferences in favor of the non-moving party. * * * Then, before we may dismiss the complaint, it must appear beyond doubt that plaintiff can prove no set of facts warranting a recovery." Mitchell v. Lawson Milk Co. (1988),40 Ohio St.3d 190, 192 (citations omitted).
As we said earlier, Plaintiffs' complaint is based on a series of 41 separate and unrelated real estate transactions. Because the transactions were not registered as required by Chap.1707, Plaintiffs tried to rescind the sales pursuant to R.C. 1707.43. This statute provides that sales violating R.C. Chap. 1707 are voidable at the purchaser's election.
However, before R.C. Chap. 1707 can apply, a transaction must fit within the definition of a "security." R.C. 1707.01(B) defines a security as:
 any certificate or instrument that represents title to or interest in, or is secured by any lien or charge upon, the capital, assets, profits, property, or credit of any person or of any public or governmental body, subdivision, or agency. It includes * * * promissory notes, all forms of commercial paper, evidences of indebtedness, * * * any investment contract, any instrument evidencing a promise or an agreement to pay money, * * * but sections 1707.01 to 1707.45 of the Revised Code do not apply to the sale of real estate.
Under a literal interpretation of the statute, the Ohio securities laws would obviously not apply to real estate sales. However, Ohio securities regulations are similar to the federal laws, which construe "security" broadly. State v. Taubman (1992), 78 Ohio App.3d 834, 844-45. Therefore, the specific exemption of real estate in R.C. 1707.01(B) is not automatically fatal., Plaintiffs claimed in the trial court and continue to assert on appeal that the transactions at issue were "investment contracts" instead of pure real estate sales. The trial court rejected this argument after applying two tests that have historically been used by Ohio courts to evaluate whether a particular transaction is a security. All parties agree that these tests should be used. However, Plaintiffs feel that the court improperly applied the tests by focusing on Plaintiffs' de jure control of the properties and by ignoring the reality of the investment scheme.
The first test is taken from State v. Silberberg (1956),166 Ohio St. 101, in which the Ohio Supreme Court held that:
 [i]n determining whether an interest is an investment contract or an interest in a real estate transaction, the principal test is the individual control which the purchaser has over the property or business venture in which he has acquired the interest. If the purchaser is to share in the gross proceeds or net profits of operations managed by the one who is disposing of the interest, the instrument evidencing the interest transferred is generally considered as an investment contract; but, if the purchaser of real property with others is to occupy the premises and conduct the enterprise, the instrument evidencing the interest is generally not an investment contract or security.
Id. at paragraph one of the syllabus.
In applying Silberberg, the trial court first noted that the gross proceeds of an operation must be managed by the party disposing of the interest. The parties who managed the operations in the present case were Alexander, GPA, and Therax. However, there were no allegations in the complaint that Alexander, GPA, or Therax disposed of an interest in any of the properties. Apparently, during briefing, one party did identify a parcel that was initially owned by GPA and was purchased by a Plaintiff. Although this went beyond the allegations in the complaint, the trial court still considered it. However, the court then concluded that at least some of the real estate purchases could not meet the requirement under Silberberg that the gross proceeds must be managed by the party disposing of the interest.
On appeal, Plaintiffs do not argue with this conclusion of the trial court. Instead, they focus on the court's other findings on the issue of "control." In this regard, the trial court noted, based on Silberberg, that Plaintiffs retained individual control over the property because they had "unfettered ownership" and "ultimate control." Specifically, as owners, Plaintiffs had full authority to decide how to manage their properties. Plaintiffs believe, however, that the trial court concentrated too much on the mere fact of title ownership. According to Plaintiffs, the court should instead have followed federal cases which have found that real estate investments can be securities. The primary cases Plaintiffs rely on are Woolridge Homes, Inc. v. Bronze Tree, Inc. (D.Colo. 1983), 558 F. Supp. 1085, and Hodges v. HR Investments, Ltd. (N.D.Miss. 1987), 668 F. Supp. 545.
As a preliminary point, we note that Ohio case law applies to Ohio's statutory definition of a security. Therefore, we do not have to consult case law interpreting federal law. Brannon v. Rinzler (1991),77 Ohio App.3d 749, 753. However, even if we were inclined to apply federal law, the cases Plaintiffs cite compel no different conclusions than the ones the trial court reached.
Under federal law, a scheme will be considered a security or investment contract if an individual "`1) invests his money 2) in a common enterprise, and 3) expect[s] profit solely from the efforts of a promoter or a third party.'" Woolridge, 558 F. Supp. at 1086, quoting from Securities Exchange Comm. v. W. J. Howey Co. (1946), 328 U.S. 293,66 S.Ct. 1100, 90 L.Ed.2d 1244. In Woolridge, the plaintiff agreed to purchase a unit in a condominium project that was being developed, and tendered $25,000 in earnest money. 558 F. Supp. at 1085. The purchase was for investment purposes, and plaintiff did not expect to do management for the unit. Because the project experienced construction delays, it was not built on time. Ultimately, the plaintiff sued for recission of the agreement and return of the deposit money.
In deciding if the claims should survive a motion to dismiss, the trial court first found that the plaintiff had invested his money. Id. at 1087. Next, the court found both vertical and horizontal commonality, which are criteria used by federal courts to decide if a "common enterprise" exists. See, e.g., Dekebach v. La Vida Charters, Inc. of Florida (C.A. 6 1989), 867 F.2d 278, 281-82 (noting that the Sixth Circuit requires horizontal commonality and has rejected vertical commonality. In contrast, some circuits allow vertical commonality.)
Vertical commonality is a "one-to-one arrangement between the customer and broker." Woolridge, 568 F. Supp. at 1087. In contrast, "[a] horizontal relationship is between an individual investor and a pool of other investors." Id. "In a common enterprise marked by horizontal commonality, the fortunes of each investor depend on the profitability of the enterprise as a whole." Revak v. SEC Realty Co. (C.A. 2 1994),18 F.3d 81, 87. Typically, "each investor's fortune is tied to the fortunes of other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." Id. (citation omitted). The Sixth Circuit's reason for rejecting vertical commonality is that it eliminates the Howey requirement of a "common enterprise."867 F.2d at 281.
In Woolridge, the court found that horizontal commonality existed because each investor was in a common enterprise with other investors.568 F. Supp. at 1087. In this regard, the court explained:
 [i]t is undisputed that defendant was in effect "pooling" pre-sale purchase commitments in order to obtain construction funding to fund the project. It is evident that the project would have gone forward only if sufficient investor interest had been generated on a pre-sale basis. If sufficient investor interest was not generated, the defendant would cancel the project by exercising its right under the purchase agreement.
Id. Unlike Woolridge, the transactions in the present case involved 41 separate real estate purchases of existing property between September 16, 1999, and December 17, 1999. Four parties purchased the properties, using 14 lenders. This was not a "project" by any stretch of the imagination, and there is no indication that the transactions shared any type of commonality. The only common "thread" here is the alleged intent of Alexander, GPA, and Therax, and perhaps others, to fleece the Plaintiffs. However, that fact does not transform these real estate sales into securities transactions., Plaintiffs also rely on Hodges. Again, however, in that case, the investors' prospects depended on the overall success of the condominium project in which they invested.668 F. Supp. at 550. Accordingly, we find nothing in the cases cited by Plaintiffs to convince us that the trial court erred.
The second test the trial court used was taken from State v. George (1975), 50 Ohio App.2d 297. In George, the Tenth District Court of Appeals noted that it had previously refined the Silberberg test to fit the modern necessities of the business world. Id. at 302, citing Peltier v. Koscot Interplanetary, Inc. (Nov. 17, 1972), Franklin App. No. 75-AP-220, unreported. The Tenth District reiterated that the refined test was "a reasonably sound one both from the standpoint of providing a pattern within which to compare the format, structure and scheme of the offering, and also providing the requisite flexibility demanded by the economic realities of modern day business ingenuity." Id. As a result, the court held that an investment contract, i.e., a security exists, when:
 "(1) an offeree furnishes initial value to an offeror, and (2) a portion of this initial value is subjected to the risks of the enterprise, * * * and (3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and (4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise."
50 Ohio App.2d at 302-03 (citation omitted). In the past, our own district has used the George test to evaluate whether certain interests were securities. See Brannon, 77 Ohio App.3d 749, and Cox v. Lemonds (1995), 107 Ohio App.3d 442.
Again, Plaintiffs do not quarrel with use of the test; they simply feel the trial court misapplied it. Concerning the first prong, the trial court noted that the offeror of the alleged investment program was Theran Alexander, through Therax and GPA. However, the court also found that except for one property purchased from GPA, the promissory notes signed on each property and any additional money paid at closing did not represent money paid to the offeror. Plaintiffs feel that this finding ignores the economic realities of the situation. Allegedly, Theran, GPA, and Therax (the offerors) were co-conspirators with the sellers of the property, and took the excess money at closing from the fraudulently valued property and inflated closing costs. Therefore, Plaintiffs believe that the first prong of the test is satisfied.
We do not need to decide this point. Even if we assume that initial value was furnished, we agree with the trial court that the remaining prongs of the George test were not satisfied.
The second prong of the George tests requires that "a portion of this initial value is subjected to the risks of the enterprise." Id. at 302. In discussing this prong, the trial court noted that even if initial value had been offered, the purchases still did not involve a common enterprise. In this regard, the trial court focused on the Sixth Circuit requirement of horizontal commonality as a predicate for a common enterprise. However, the trial court found no horizontal commonality because the success or failure of each real estate venture was not linked to the others. We agree with that conclusion.
In addressing this issue, Plaintiffs note that Ohio has not adopted the horizontal commonality standard. This is technically correct. And, as we said earlier, Ohio is not required to follow federal law in this area. Nonetheless, in view of the similarity of the Ohio and federal statutes, we see nothing harmful in being aware of federal interpretation. We also note that the George test uses the word "enterprise." We think that term must mean something.
Additionally, and ironically, Plaintiffs, themselves, cite federal cases in which courts have found a "security" by looking beyond the sales of individual lots to the actions of the developer. However, we do not find these cases either factually similar or persuasive. For example, in McCown v. Heidler (C.A. 10 1975), 527 F.2d 204, the plaintiffs bought lots in a large real estate development. When the developers failed to complete the development obligations, the plaintiffs brought suit based on securities violations. Id. at 206. According to the allegations in a proposed amended complaint, the lots were vacant and were of little value unless the developers fulfilled their obligations. Id. at 209. In particular, the developers had promised to improve the project to include such items as a country club, an 18 hole golf course, and so on. Id. Ultimately, the Tenth Circuit Court of Appeals found that the plaintiffs were entitled to proceed with their securities claim. In this regard, the court noted that:
 without the substantial improvements pledged by * * * [the defendants] the lots would not have a value consistent with the price which purchasers paid. * * * The utilization of purchase money accumulated from lot sales to build the promised improvements brings the scheme within the "common enterprise" definition.
Id. at 211 (citation omitted).
Unlike the lots in McCown, the 41 properties in the present case were not part of the same development project, nor is there any indication that funds were being pooled to be used for improvements. As we mentioned earlier, in a common enterprise, each individual investor's fortune is "tied to the fortunes of the other investors by the pooling of assets, usually combined with the pro-rata distribution of profits." Revak,18 F.3d at 87., Plaintiffs try to overcome this problem by claiming that the money used to pay the $3,000 per unit investment payment would have had to come from the "pool" of investment proceeds. Since most of the payments were apparently not made, the presence of a "pool" is questionable. However, even if payments were used in this manner, any funds generated or skimmed had nothing to do with the success or failure of the individual real estate purchases. Each property was not connected to the others. Plaintiffs also did not claim that funds were being pooled to improve the properties or that improvements to one property would have had any effect on the others. Accordingly, we see no evidence of a common enterprise., Plaintiffs also rely on Aldrich v. McCulloch Properties, Inc. (C.A. 10 1980), 627 F.2d 1036. Again, however, Aldrich involved purchases of lots in a specific development, promises that the lots would increase in value due to the defendants' development activities, and promises of a trust designed to construct and operate facilities for the common benefit of the purchasers. Id. at 1039. Clearly, these facts indicate a common enterprise. Since such an enterprise is lacking in this case, the second and third prongs of the George test (which depend on the existence of an enterprise) are not satisfied.
As a final matter, the allegations in this case also fail to comply with the requirements of the fourth prong, i.e., that "the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise." 50 Ohio App.2d at 303. In this regard, the trial court relied on the fact that Plaintiffs, as titled owners, retained actual control over their properties. According to Plaintiffs, this conclusion places undue emphasis on fee ownership and improperly expands Silberberg by preventing any securities claims based on purchase of a fee estate. Plaintiffs contend that Silberberg did not rely on fee ownership, but instead focused on occupancy, i.e., whether the purchasers lived on the premises.
We do not think "control" should be solely contingent on the status of a purchaser's living arrangements. As the court in Silberberg noted, the demarcation lines of a security have generally been drawn on a case to case basis. 166 Ohio St. at. 104. Consequently, no one factor automatically controls. Admittedly, the plaintiffs in Silberberg intended to live on the premises, and that is one point the court considered in deciding if the plaintiffs retained individual control. Id. at 107. Clearly, in such a situation, the owner would retain control over his or her property. However, occupancy is not the only possible factor.
For example, in Brannon, we noted that the plaintiffs retained practical and actual control over certain managerial decisions, due to provisions in a partnership agreement that allowed partners to remove the managing agent. See 77 Ohio App.3d at 753. We also relied on a provision permitting dissolution and liquidation of the partnership. Id. Similarly, in Cox, we concentrated on the fact that the management agreement and the parties' conduct gave the plaintiff the right to exercise "some practical and actual control over managerial decisions." 107 Ohio App.3d at 447. Although Brannon and Cox did not involve real property, they do demonstrate that control can be affected or altered by agreements. This would be true also in the real estate context.
In the present case, the Plaintiffs did not attach copies of any management agreements to the complaint, nor did they allege that they were precluded by the terms of such agreements from exercising control over their property. Instead, the complaint simply indicates that Plaintiffs purchased the properties and that Alexander would manage the properties. In considering this point, the trial court noted the lack of any indication that Plaintiffs had given up the right of control over their property. We agree with this conclusion, since the allegations in the complaint, construed most strongly in Plaintiffs' favor, do not indicate that Plaintiffs lacked control over the property. Again, we do not rely strictly on the fact that Plaintiffs were the titled owners, although that is certainly a factor. Instead, the complaint is devoid of any allegation that Plaintiffs, as offerees, failed to "receive the right to exercise practical and actual control over the managerial decisions of the enterprise." George, 50 Ohio App.2d at 303. As the trial court noted, the fact of ownership indicates the right of control, and no allegations were made that control was restricted in any significant way. As an example, Plaintiffs could have contended (if true), that they were precluded by contract from selecting a different management company. However, they failed to make such allegations. In any event, we note that even if such allegations were made, Plaintiffs' complaint would still fail to state a claim because no common enterprise was involved.
Based on the preceding discussion, the Plaintiffs' single assignment of error is overruled and the judgment of the trial court is affirmed.
FAIN, J., concurs.