The STATE of Ohio, Appellee,

v.

TAUBMAN, Appellant.

[Cite as *State v. Taubman* (1992), 78 Ohio App.3d 834.]

Court of Appeals of Ohio,
Montgomery County.

No. 12356.

Decided March 12, 1992.

*Lee C. Falke,* Prosecuting Attorney, and *Lorine M. Reid,* Assistant Prosecuting Attorney, Appellate Division, for appellee.

*John H. Rion,* for appellant.

---

BROGAN, Judge.

The appellant Naomi Taubman appeals from her conviction after a jury trial of thirty-four counts of selling securities without a license and selling unregistered securities in violation of R.C. 1707.44(A) and 1707.44(C)(1).

Taubman has raised three assignments of error in this appeal. In her first assignment she contends "it was prejudicial misconduct for the prosecution to elicit evidence that individuals lost money as a result of their loans to appellant and for the prosecutor to comment on such evidence when she was not indicted for any theft offense." In her second assignment she contends

the trial court erred in instructing the jury, pursuant to an administrative regulation, in such a manner that she was denied her right to prove the affirmative defense of a "private offering" provided by R.C. 1707.02(G). In her last assignment she contends that the definitions of "security" and "sale" as found in R.C. 1707.01(B) are fatally vague and violate the Due Process Clauses of the United States and Ohio Constitutions.

The appellant is a sixty-five-year-old woman who has been in the tax preparation business for many years as well as operating a real estate business. The evidence disclosed that the appellant invested a substantial sum of money in a nursing home development. In order to finance that investment she solicited funds from many of her tax clients.

The state contends that the appellant encouraged her tax clients to "invest" their funds with her for a high rate of return and violated the Blue Sky Laws of the state of Ohio, regulating the sale of unregistered securities. The defense contends Taubman merely borrowed money from her clients and was unable to pay them back.

Naomi Woodfork, a retired nursing assistant, stated that the appellant had prepared her and her husband's taxes for over twenty-five years. Woodfork testified that appellant called her in mid-December 1988 and told her she had some investments and she had a spot open in a group of investors and they could earn fifteen to eighteen percent on a $10,000 investment. She said she decided to give appellant $5,000, although appellant did not tell her what she was going to do with her money. She said appellant told her there was no way she could lose her money in this investment. She said appellant told her her money was safer with appellant than with the banks. She testified she never got her money back from appellant. She stated she signed a document identified as State's Exhibit 3. That exhibit provides in pertinent part:

"THIS AGREEMENT made and entered into by and between NAOMI M. TAUBMAN, hereinafter referred to as Mrs. Taubman, and Horace & Naomi Woodfork, hereinafter referred to as The Woodfork's [sic].

"1. The Woodfork's has on or prior to the date hereof paid to Mrs. Taubman the sum of $5,000.00, hereinafter referred to as the principal sum, receipt of which is acknowledged by Mrs. Taubman.

"2. In order to provide the Woodfork's with funds from which they may pay their living expenses, Mrs. Taubman will return the principal sum to the Woodfork's in quarterly installments, each of which shall be one and one half per cent (1½%) of the principal sum and which shall be paid on the 9th day of each month beginning on April 9, 1989. The quarterly payments shall continue until the principal sum has been repaid in full, unless repayment of the principal sum has been repaid in full, unless repayment of the principal

sum has been accelerated pursuant to Item 4 hereof. Neither the principal sum nor the monthly repayment installments shall bear interest.

"3. Mrs. Taubman will invest the principal sum in such manner as she, in her sole discretion, deems most appropriate.

"4. Upon the termination, expiration or redemption of the investment made by Mrs. Taubman with the principal sum, Mrs. Taubman will pay to the Woodfork's the full original amount of the principal sum, without any reduction for the monthly installments paid during the term of the investment. Mrs. Taubman shall have the right in her sole discretion to determine when the investment should be terminated or redeemed, subject only to the requirement that the investment be held for such time as to qualify the profit therefrom as a capital gain.

"Upon the termination, expiration or redemption of the investment, Mrs. Taubman will make an accounting thereof to the Woodfork's, such as will enable the Woodfork's to report the investment for federal income tax purposes as though the investment has been made by them personally.

"Mrs. Taubman, during the term of this investment[,] will continue to maintain life insurance policies upon which the Woodfork's will be designated as beneficiary. All monies paid to the Woodfork's by a life insurance company by reason of designation of them as beneficiary by Mrs. Taubman shall be credited to payment of this obligation.

"The investor has the right to terminate this agreement at any time by thirty (30) days written notice to Mrs. Taubman.

"5. In the event Mrs. Taubman's investment of the principal sum yields a net profit in excess of the amount guaranteed to be returned to the Woodfork's pursuant to Item 4 hereof, such excess profit shall be ratably divided between Mrs. Taubman and the Woodfork's in such shares as Mrs. Taubman shall determine.

"6. In the event of the death of the Woodfork's, Mrs. Taubman will pay the entire amount owing to the Woodfork's on the date of their death to their estate not later than six months after the appointment of the Executor or Administrator of the estate.

"7. THIS AGREEMENT represents the complete agreement of the parties concerning their financial transactions. Any agreements, promissory notes or other document executed by either of the parties to the other prior to the date of this Agreement are void.

"8. THIS AGREEMENT may be modified by the parties, but no modification shall be valid unless it is in writing and signed by both parties.

"9. THIS AGREEMENT is a personal agreement between the parties and is not assignable or transferable by either of the parties in any manner whatsoever.

"10. In the event of the death of Mrs. Taubman, her estate shall pay the entire principal due at that time.

"Signed at Dayton, Ohio, this 9th day of January, 1989."

John Stacy testified the appellant called him and stated that a friend of hers was going into business and she was going to invest $60,000 in the business and she needed Stacy to invest $10,000 in the business and she would guarantee the money would be safe. Stacy stated he was able to raise $5,000, which he gave to appellant. In return for the $5,000, appellant gave Stacy a cognovit note evidencing a promise to pay Stacy the principal sum in one year with an annual interest rate of eighteen percent.

James Gaveli testified the appellant had prepared his tax returns for some forty years. He testified that in February 1988 he and his wife went to the appellant to have their tax returns prepared and appellant said that it would be a requirement that they invest some money with her before she would prepare the Gavelis' returns. Gaveli said he returned to his home in Medina, Ohio, and mailed a $5,000 check to Taubman, who then sent him an agreement identical to that provided Naomi Woodfork. Gaveli stated he never recovered any of the $5,000 from Taubman.

Between January 8, 1988 and January 1, 1989, the appellant signed six promissory notes in favor of Reed Van Doren in the total amount of $328,000, representing "investments" made by Van Doren and his mother. The nature of the "investments" was never clear in the record.

Erwin Manny, a retired mechanical engineer from New Jersey, testified that Taubman began doing his taxes ten years ago and she tried on a number of occasions to get him to invest some money with her and finally he succumbed. She called him in New Jersey and told him one of her investors had backed out, that "this was a quasi-governmental sort of deal and that it was limited to 38 people and if I acted quickly, I could get in on the investment." He stated he invested $52,000 with appellant and she sent an agreement for him to sign. The agreement was identical to the agreements signed by Woodfork and Gaveli. Manny testified he received two payments approximating $10,000 but never received any of the rest of his original investment. Manny said the appellant explained she had difficulty paying pursuant to the "agreement" because "the HUD project was screwed up."

Albert Hollis, a retired city of Dayton maintenance supervisor, testified the appellant suggested he invest money in public housing and told him her

"license" would only allow thirty-six people to invest. Hollis then gave appellant personal checks amounting to $89,000. Appellant had Hollis and his wife execute an agreement identical to that presented to the Woodforks, the Gavelis, and Erwin Manny. Hollis testified he and his wife never received any payment per the "agreement."

John and Marilyn Cole, retirees and clients of the appellant, similarly invested $20,000 with the appellant and signed the typical "agreement." Cole stated appellant represented that the money he gave appellant was being used to finance the purchase of a HUD project in Troy, Ohio. Cole stated he received five or six payments pursuant to the "agreement," but the payments stopped.

Charles Trupp, retired from the United States Air Force, testified appellant did his taxes while he was in the military and he invested $12,000 with appellant pursuant to the terms of the typical "agreement." Trupp stated appellant repaid approximately $5,000 of the initial investment.

Carole Allen testified she was a clerk typist and appellant prepared her taxes. Allen testified appellant called her and asked if she desired to invest $1,000 with her and she agreed. Pursuant to that oral agreement appellant executed a cognovit note evidencing the obligation. She received no payments pursuant to the note.

Annabelle Tittle gave appellant $33,000 to invest pursuant to the typical "agreement." Appellant had prepared Tittle's taxes for twenty-five years and she trusted appellant would invest her money wisely. She also was not repaid pursuant to the "agreement."

Between July 1987 and September 1987, William and Helen Smith executed three typical "agreements" evidencing payments exceeding $350,000 to the appellant. Helen Smith testified the only money received in return for these payments were interest payments. On cross-examination she acknowledged investing funds with appellant since 1978 and recovering over $350,000 in interest payments.

Eugene and Patricia Sommers invested $87,000 with appellant and received two promissory notes in exchange for the investment. James and Lorene Boggs invested $46,000 with appellant and received a promissory note in exchange.

Richard and Audrey Boggs invested $87,000 with appellant and received the typical "agreement" to repay the money at fifteen percent interest quarterly. J.R. and Eileen Gunter invested $559,000 with appellant and received four promissory notes and one loan "agreement" in exchange.

The state presented evidence that appellant never filed an application with the Ohio Division of Securities for a license to sell securities. Likewise, appellant never filed an application to register securities with the Ohio Division of Securities or sought an exemption from the registration requirements.

During opening statements, the prosecutor indicated to the jury that the appellant was in default of payment of all the promissory notes and loan "agreements" issued to her clients and that none of her victims had been repaid their original investment. No objection was interposed by counsel for appellant to these opening remarks of the prosecutor.

Counsel for the appellant in his opening statement noted that appellant had "borrowed in this community over $9,000,000 and she's paid back approximately $7,400,000."

Naomi Woodfork testified, without objection, that the appellant never recovered the money she gave appellant pursuant to the agreement.

■ At the conclusion of the first day of trial, counsel for appellant lodged his first objection to the state's eliciting evidence of the repayment of the monies paid the appellant. Counsel contended that such evidence was irrelevant to any issue raised by the indictment. We agree with appellant that the fact that the victims named in the indictment lost money because of the appellant's conduct was not relevant to the issues raised in the indictment. A person may be prosecuted for selling unregistered securities or for selling without a license without regard to whether the purchaser of the security obtains a profit or a loss in the transaction. See, generally, *State v. Trivedi* (1982), 8 Ohio App.3d 412, 8 OBR 534, 457 N.E.2d 868.

■ In this case the jury heard the prosecutor inform them that the victims were not repaid their investments. Counsel for appellant himself informed the jury of this fact. The appellant also did not contest that she entered into these transactions with her tax clients. She contends the transactions were not covered by Ohio's securities laws. We fail to see how the evidence prejudiced the appellant in light of counsel's failure to timely object and in light of counsel's admissions made in opening statement. The first assignment is overruled.

■ In her second assignment she contends the trial court erred by instructing the jury pursuant to administrative regulation in such a way that appellant was denied the right to prove the affirmative defense provided by R.C. 1707.02(G), that is, "commercial paper and promissory notes are exempt [from registration] when they are not offered directly or indirectly for sale to the public."

This assignment of error has no application to those counts in the indictment which charged the appellant with selling "investment agreements" as the exemption provided in R.C. 1707.02(G) has no application to "investment agreements."

The state requested and received the following instruction over the objection of the appellant:

"Commercial paper and promissory notes are exempt when they are not offered, directly or indirectly, *for sale to the public. Exemption for sale of commercial papers and promissory notes as proscribed in the security law is restricted to sale to officers and directors only.* Commercial paper and promissory notes otherwise offered to existing security holders, employees and all other natural persons is [*sic*] deemed offered to the public." (Emphasis added.)

Counsel for the appellant made the following objection to the requested instruction:

"MR. RION: I would object to that, Your Honor, as this being a statutory defense and as set out is clear and to embellish the statute with some type of administrative rule is, or code is improper and that this specifically sets out in the statute what it is that the legislature intended to be prescribed, R.C. 2901.03 provides there are no common law offenses in the State of Ohio, that R.C. 2901.04 requires that sections defining offenses or penalties be strictly construed against the state and liberally construed in favor of the accused, and on a practical point if that construction were given, no person who wasn't a director of a corporation could engage in the transfer of a promissory note at any level, no family member, and therefore his definition goes beyond all practical application and even more, envelops and makes all forms of exchange illegal which clearly they are not.

"MR. SKINNER: I know that is the law and that has been enacted in the Ohio Administrative Code and that's what the Division of Securities follows. That is, the limitations on sales, exemptions, what you're talking about, trying to get an exemption from the registration requirements, okay, and that Ohio Administrative Code section was passed to restrict this particular exemption. There's a lot of others but it restricts this particular exemption for sales to the public too and it's limited to officers and directors. Now that's all there is to it. Sales to anybody else is [*sic*] a sale to the public.

"MR. RION: I'd suggest with that interpretation it envelops every use of a promissory note except officer or director of a corporation which clearly cannot, you know, encompass and envelops innocent conduct and makes such an innocent criminal. I'll, plus while a person may be presumed to know the law, certainly they can't be presumed to know all the different administrative

regulations, and on that basis we feel if the Judge embellishes or enhances something other than the legislature provided in R.C. 1707.02(G) that would violate the, my client's constitutional rights."

Pursuant to R.C. 1707.20(A), the legislature granted the Division of Securities the power to adopt, amend, and rescind those rules which are necessary to carry out R.C. 1707.01 to 1707.45. That section also grants to the Division of Securities the power to define terms used in R.C. 1707.01 to 1707.45 insofar as the definitions are not inconsistent with said sections.

The purpose of administrative rulemaking is to facilitate the administrative agency's placing into effect the policy declared by the General Assembly in the statutes to be administered by the agency. The agency may not issue rules which are in clear conflict with statutory enactments covering the same subject matter. *Carroll v. Dept. of Adm. Serv.* (1983), 10 Ohio App.3d 108, 10 OBR 132, 460 N.E.2d 704.

The Ohio Securities Act was adopted to prevent fraudulent exploitations through the sale of securities. *United States v. Tehan* (C.A.6, 1966), 365 F.2d 191, 194. It is reasonable to assume that the legislature did not mean to protect "insiders" or those with managerial responsibility when a business organization offers commercial paper and promissory notes for sale but the legislature did mean to protect all others. The rule does not contravene or impermissibly narrow the statutory exemption. Appellant contends the rule unduly restricts her right to sell promissory notes to her friends and business clients. There is no suggestion that the Ohio legislature meant to exempt friends and clients from the protective sweep of this legislation. Indeed, it meant to exempt people like the victims in this case who are most vulnerable to being exploited by persons like the appellant. The assignment of error is overruled.

█ In her third assignment, appellant contends the statutory definitions of "security" and "sale" are fatally vague so as to violate the Due Process Clause of the United States and Ohio Constitutions.

R.C. 1707.01(B) provides:

" 'Security' means any certificate or instrument *which represents title to or interest in, or is secured by any lien or charge upon, the capital, assets, profits, property, or credit of any person* or of any public or governmental body, subdivision, or agency. It includes shares of stock, certificates for shares of stock, voting-trust certificates, warrants and options to purchase securities, subscription rights, interim receipts, interim certificates, *promissory notes*, all forms of commercial paper, evidences of indebtedness, bonds, debentures, land trust certificates, fee certificates, leasehold certificates,

syndicate certificates, endowment certificates, certificates or written instruments in or under profit-sharing or participation agreements or in or under oil, gas, or mining leases, or certificates or written instruments of any interest in or under the same, receipts evidencing preorganization or reorganization subscriptions, preorganization certificates, reorganization certificates, certificates evidencing an interest in any trust or pretended trust, *any investment contract,* any instrument evidencing a promise or an agreement to pay money, warehouse receipts for intoxicating liquor, and the currency of any government other than those of the United States and Canada, but such sections shall not apply to bond investment companies or to the sale of real estate." (Emphasis added.)

"Sale" is defined in R.C. 1707.01(C) as follows:

" 'Sale' has the full meaning of 'sale' as applied by or accepted in courts of law or equity, and includes every disposition, or attempt to dispose of a security or of an interest in a security. 'Sale' also includes a contract to sell, an exchange, an attempt to sell, an option of sale, a solicitation of a sale, a solicitation of an offer to buy, a subscription, or an offer to sell, directly or indirectly, by agent, circular, pamphlet, advertisement, or otherwise."

As with all statutes designed to promote the public health, safety, and welfare, these statutes enjoy a strong presumption of constitutionality. See *Jackman v. Court of Common Pleas* (1967), 9 Ohio St.2d 159, 38 O.O.2d 404, 224 N.E.2d 906. The party alleging that the statute is unconstitutional must prove this assertion beyond a reasonable doubt.

In order to prove that a statute is unconstitutionally void for vagueness, the challenging party must show that, upon examining the statute, an individual of ordinary intelligence would not understand what he is required to do under the law. In other words, he must prove beyond a reasonable doubt that the statute was so unclear that he could not reasonably understand that it prohibited the acts in which he engaged. See *United States v. Harriss* (1954), 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989; *State v. Anderson* (1991), 57 Ohio St.3d 168, 566 N.E.2d 1224.

There is nothing unclear about the terms "security" and "sale" as found in R.C. 1707.01(B) and (C)(1).

The Sixth Circuit Court of Appeals has held that the Ohio Securities Act, prohibiting the sale of securities which are not otherwise exempt, forewarns of its reach and coverage. The court held that the language sufficiently conveys a definite warning as to the proscribed conduct, when measured by common understanding and commercial practice. *United States v. Tehan* (C.A.6, 1966), 365 F.2d 191.

In *United States v. Crosby* (C.A.2, 1961), 294 F.2d 928, the court held the alleged amorphous character of the "public offering" exemption in the criminal provisions of the Securities Act of 1933 did not render the provision unconstitutionally vague in view of the judicial gloss placed on the provision in *Securities & Exchange Comm. v. Ralston Purina Co.* (1953), 346 U.S. 119, 73 S.Ct. 981, 97 L.Ed. 1494. In that case the Supreme Court defined the standard to be applied in determining whether an issue is a public offering. It held the governing fact is whether persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information. *Id.* at 125–127, 73 S.Ct. at 984–985, 97 L.Ed. at 1498–1500. See, also, *Gilligan, Will, & Co. v. Securities & Exchange Comm.* (C.A.2, 1959), 267 F.2d 461.

Appellant complains that the definitions of "sale" and "security" are so broad that the provisions of Ohio's securities law could embrace perfectly innocent behavior, to wit, borrowing money from friends and giving them promissory or cognovit notes to evidence the transaction.

It is clear that the assailed definitions of R.C. 1707.01 must be read in conjunction with the rest of R.C. Chapter 1707, in particular R.C. 1707.02, which provides that certain securities are exempt from the provisions of Ohio's blue sky laws.

Congress' purpose in enacting the federal securities laws was to regulate investments, in whatever form they are made and by whatever name they are called. *Reves v. Ernst & Young* (1990), 494 U.S. 56, 110 S.Ct. 945, 108 L.Ed.2d 47. Justice Marshall noted in 494 U.S. at 60–61, 110 S.Ct. at 949, 108 L.Ed.2d at 56–57:

"The fundamental purpose undergirding the Securities Acts is 'to eliminate serious abuses in a largely unregulated securities market.' *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 849 [95 S.Ct. 2051, 2059, 44 L.Ed.2d 621, 630] (1975). In defining the scope of the market that it wished to regulate, Congress painted with a broad brush. It recognized the virtually limitless scope of human ingenuity, especially in the creation of 'countless and variable schemes devised by those who seek the use of the money of others on the promise of profits,' *SEC v. W.J. Howey Co.,* 328 U.S. 293, 299 [66 S.Ct. 1100, 1103, 90 L.Ed. 1244, 1249–1250] (1946), and determined that the best way to achieve its goal of protecting investors was 'to define "the term 'security' in sufficiently broad and general terms so as to include within that definition the many types of instruments that in our commercial world fall within the ordinary concept of a security." ' *Forman, supra* [421 U.S.], at 847–848 [95 S.Ct., at 2058–2059, 44 L.Ed.2d, at 629–630] (quoting H.R.Rep. No. 85, 73d

Cong., 1st Sess., 11 (1933)). Congress therefore did not attempt precisely to cabin the scope of the Securities Acts. Rather, it enacted a definition of 'security' sufficiently broad to encompass virtually any investment that might be sold as an investment." (Footnote omitted.)

Ohio securities laws are very similar to the federal legislation. Although appellant characterized her activity as merely borrowing money from friends in exchange for high rates of interest, the "agreement" which was given many of the victims clearly was an "investment agreement" within the purview of R.C. 1707.01. The agreement provided that the victims would give money to Taubman to invest as she saw fit. The agreement provided for guaranteed profits and possible profit sharing. In effect, Taubman operated a mutual fund for the benefit of the investors. The agreement even required that Taubman give an accounting so that the victims could report "the investment" for federal income tax purposes.

If the purchaser is to share in the gross proceeds or net profits of operations managed by the one who is disposing of the interest, the instrument evidencing the interest transferred is generally considered as an investment contract. *State v. Silberberg* (1956), 166 Ohio St. 101, 1 O.O.2d 221, 139 N.E.2d 342; see *Emery v. So–Soft of Ohio, Inc.* (1964), 30 O.O.2d 226, 199 N.E.2d 120, and *State v. George* (1975), 50 Ohio App.2d 297, 4 O.O.3d 259, 362 N.E.2d 1223.

In some instances, the appellant gave her clients cognovit notes rather than have the typical agreement executed. The circumstances surrounding these transactions were similar to those in which agreements were utilized. In each instance the appellant obtained money on the promise that appellant's investment skills would generate a high rate of return to appellant's clients. Ohio's blue sky laws are clearly meant to bring these types of transactions within its regulation.

■ Appellant contends that the statutory definitions are overbroad and bring within their ambit innocent behavior, citing *Cox v. Louisiana* (1965), 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471. The "overbreadth" doctrine has application where a regulation or law impermissibly affects First Amendment protections. None is implicated here.

■ Appellant is concerned that the statute could be misapplied to otherwise innocent conduct. A person to whom a statute may be constitutionally applied may not be heard to challenge the statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the court. *Broadrick v. Oklahoma* (1973), 413 U.S. 601, 610, 93 S.Ct. 2908, 2914–2915, 37 L.Ed.2d 830, 838. See, also, *State v. Ferguson* (1991), 57

Ohio St.3d 176, 566 N.E.2d 1230.  The law was properly applied in this case. The assignment of error must be overruled.

The judgment of the trial court will be affirmed.

*Judgment affirmed.*

WOLFF, J., concurs.

FAIN, P.J., dissents.

FAIN, Presiding Judge, dissenting.

Although I concur with the opinion of this court in every other respect, I cannot agree with its disposition of Taubman's Second Assignment of Error.

R.C. 1707.02(G) provides as follows:

"Commercial paper and promissory notes are exempt when they are not offered directly or indirectly for sale to the public."

In my view, Ohio Adm.Code 1301:6-3-02(C), which provides that commercial paper and promissory notes are exempt only if they are offered to officers and directors of the maker, impermissibly restricts the scope of the exclusion provided for in R.C. 1707.02(G).  As Taubman points out, a promissory note sold to one's brother for cash would not be exempt under the regulation, because it would not have been offered to an officer or director of the maker.

The words of the statute clearly establish that a private transaction involving commercial paper or promissory notes, between two persons having a close personal relationship, is not intended to be encompassed within the reach of the Ohio securities laws.  Taubman attempted to make use of this exemption by claiming that a number of her victims were not merely members of the public with whom she transacted, but were close personal friends from whom she borrowed money evidenced by promissory notes.  The evidence in support of this argument is weak; nevertheless, she was entitled to go to the jury with her argument that those transactions were exempt from Ohio's securities laws.  The trial court's instruction that this exemption was available only to sales of paper or notes to officers or directors prevented Taubman from having the jury consider her argument with respect to those transactions that involved promissory notes.

I would sustain Taubman's second assignment of error with respect to those counts that involved promissory notes.