### The PROCTER & GAMBLE COMPANY, Plaintiff,

v.

### BANKERS TRUST COMPANY and BT Securities Corporation, Defendants.

No. C–1–94–735.

United States District Court, S.D. Ohio, Western Division.

May 9, 1996.

Thomas S. Calder, John D. Luken, Dinsmore & Shohl, Cincinnati, OH, Stanley M. Chesley, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, James J. Johnson, General Counsel, Gary Hagopian, Procter & Gamble Co., Cincinnati, OH, Matthew Gluck, Fried, Frank, Harris, Shriver & Jacobson, New York City, for Procter & Gamble Co.

Thomas Ridgley, Glenn V. Whitaker, Daniel J. Buckley, Vorys, Sater, Seymour & Pease, Cincinnati, OH, Michael A. Cooper, Richard H. Klapper, Sullivan & Cromwell, New York City, Michael E. Wiles, Debevoise & Plimpton, New York City, for Bankers Trust Co.

*OPINION AND ORDER (1) DISMISSING SECURITIES, COMMODITIES AND OHIO DECEPTIVE TRADE PRACTICES CLAIMS; (2) GRANTING SUMMARY JUDGMENT ON BREACH OF FIDUCIARY DUTY, NEGLIGENT MISREPRESENTATION AND NEGLIGENCE CLAIMS; AND (3) SETTING FORTH DUTIES AND OBLIGATIONS OF THE PARTIES*

FEIKENS, District Judge, sitting by Designation.

## I. Introduction

Plaintiff, The Procter & Gamble Company ("P & G"), is a publicly traded Ohio corpora-

tion. Defendant, Bankers Trust Company ("BT"), is a wholly-owned subsidiary of Bankers Trust New York Corporation ("BTNY"). BTNY is a state-chartered banking company. BT trades currencies, securities, commodities and derivatives. Defendant BT Securities, also a wholly-owned subsidiary of BTNY, is a registered broker-dealer. The defendants are referred to collectively as "BT" in this opinion.

P & G filed its Complaint for Declaratory Relief and Damages on October 27, 1994, alleging fraud, misrepresentation, breach of fiduciary duty, negligent misrepresentation, and negligence in connection with an interest rate swap transaction it had entered with BT on November 4, 1993. This swap, explained more fully below, was a leveraged derivatives transaction whose value was based on the yield of five-year Treasury notes and the price of thirty-year Treasury bonds ("the 5s/30s swap").

On February 6, 1995, P & G filed its First Amended Complaint for Declaratory Relief and Damages, adding claims related to a second swap, entered into between P & G and BT on February 14, 1994. This second swap was also a leveraged derivatives transaction. Its value was based on the four-year German Deutschemark rate. In its First Amended Complaint, P & G also added Counts alleging violations of the federal Securities Acts of 1933 and 1934, the Commodity Exchange Act, the Ohio Blue Sky Laws and the Ohio Deceptive Trade Practices Act. I permitted P & G to file a Second Amended Complaint, which it did on September 1, 1995.

BT now moves, under Federal Rule of Civil Procedure ("Fed.R.Civ.P.") 12(b)(6), to dismiss the following nine Counts of P & G's Second Amended Complaint:

| | |
|---|---|
| Count VII | Fraudulent Sale of a Security Under Section 17 of the Securities Act of 1933 |
| Count VIII | Violation of Section 10(b) of the Exchange Act of 1934 and Rule 10b–5 |
| Count IX | Fraud in the Sale of Security in Violation of Section 1707.41 of the Ohio Revised Code |
| Count X | Violations of Section 1707.42 of the Ohio Revised Code |
| Count XI | Violations of Section 1707.44 of the Ohio Revised Code |
| Count XII | Willful Deception, Fraud and Cheating in Violation of the Commodity Exchange Act, § 4b |
| Count XIII | Scheme or Artifice to Defraud in Violation of the Commodity Exchange Act, § 4o |
| Count XIV | Deception, Cheating and Violation of Section 32.9 of the Rules of the Commodity Futures Trading Commission, 17 C.F.R. § 32.9 |
| Count XV | Ohio Deceptive Trade Practices |

This motion involves questions of first impression whether the swap agreements fall within federal securities or commodities laws or Ohio Blue Sky laws. These are questions of law, not questions of fact. "The judiciary is the final authority on issues of statutory construction...." *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843 n. 9, 104 S.Ct. 2778, 2781–82 n. 9, 81 L.Ed.2d 694 (1984). Mr. Justice Powell stated, in determining Congressional intent, "[t]he task has fallen to the Securities and Exchange Commission (SEC), the body charged with administering the Securities Acts, and ultimately to the federal courts to decide which of the myriad financial transactions in our society come within the coverage of these statutes." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 848, 95 S.Ct. 2051, 2058–59, 44 L.Ed.2d 621 (1975).

I conclude that the 5s/30s and DM swap agreements are not securities as defined by the Securities Acts of 1933 and 1934 and the Ohio Blue Sky Laws; that these swap agreements are exempt from the Commodity Exchange Act; that there is no private right of action available to P & G under the antifraud provisions of that Act; and that the choice of law provision in the parties' agreement precludes claims under the Ohio Deceptive Trade Practices Act. Therefore, P & G's claims in Counts VII through XV of its Second Amended Complaint are dismissed.

BT also moves for summary judgment on Counts III—V (Negligent Misrepresentation, Breach of Fiduciary Duty, and Negligence). I conclude that as a counterparty to swap

agreements, BT owed no fiduciary duty to P & G. P & G's claims of negligent misrepresentation and negligence are redundant, as I have set forth the duties and obligations of the parties under New York law. Therefore, summary judgment is granted as to Counts III—V.

## II. Background

■ Financial engineering, in the last decade, began to take on new forms. A current dominant form is a structure known as a derivatives transaction. It is "a bilateral contract or payments exchange agreement whose value derives ... from the value of an underlying asset or underlying reference rate or index." Global Derivatives Study Group of the Group of Thirty, *Derivatives: Practices and Principles* 28 (1993). Derivatives transactions may be based on the value of foreign currency, U.S. Treasury bonds, stock indexes, or interest rates. The values of these underlying financial instruments are determined by market forces, such as movements in interest rates. Within the broad panoply of derivatives transactions are numerous innovative financial instruments whose objectives may include a hedge against market risks, management of assets and liabilities, or lowering of funding costs; derivatives may also be used as speculation for profit. Singher, *Regulating Derivatives: Does Transnational Regulatory Cooperation Offer a Viable Alternative to Congressional Action?* 18 Fordham Int'l. Law J. 1405–06 (1995).

■ This case involves two interest rate swap agreements. A swap is an agreement between two parties ("counterparties") to exchange cash flows over a period of time. Generally, the purpose of an interest rate swap is to protect a party from interest rate fluctuations. The simplest form of swap, a "plain vanilla" interest-rate swap, involves one counterparty paying a fixed rate of interest, while the other counterparty assumes a floating interest rate based on the amount of the principal of the underlying debt. This is called the "notional" amount of the swap, and this amount does not change hands; only the interest payments are exchanged.

In more complex interest rate swaps, such as those involved in this case, the floating rate may derive its value from any number of different securities, rates or indexes. In each instance, however, the counterparty with the floating rate obligation enters into a transaction whose precise value is unknown and is based upon activities in the market over which the counterparty has no control. How the swap plays out depends on how market factors change.

One leading commentator describes two "visions" of the "explosive growth of the derivatives market." Hu, *Hedging Expectations: "Derivative Reality" and the Law and Finance of the Corporate Objective,* Vol. 73 Texas L.Rev. 985 (1995). One vision, that relied upon by derivatives dealers, is that of perfect hedges found in formal gardens. This vision portrays

> the order—the respite from an otherwise chaotic universe—made possible by financial science. Corporations are subject to volatile financial and commodities markets. Derivatives, by offering hedges against almost any kind of price risk, allow corporations to operate in a more ordered world.

*Id.* at 994.

The other vision is that of "science run amok, a financial Jurassic Park." *Id.* at 989. Using this metaphor, Hu states:

> In the face of relentless competition and capital market disintermediation, banks in search of profits have hired financial scientists to develop new financial products. Often operating in an international wholesale market open only to major corporate and sovereign entities—a loosely regulated paradise hidden from public view—these scientists push the frontier, relying on powerful computers and an array of esoteric models laden with incomprehensible Greek letters. But danger lurks. As financial creatures are invented, introduced, and then evolve and mutate, exotic risks and uncertainties arise. In its most fevered imagining, not only do the trillions of mutant creatures destroy their creators in the wholesale market, but they escape and

wreak havoc in the retail market and in economies worldwide.

*Id.* at 989–90.

Given the potential for a "financial Jurassic Park," the size of the derivatives market [1] and the complexity of these financial instruments, it is not surprising that there is a demand for regulation and legislation. Several bills have been introduced in Congress to regulate derivatives.[2] BT Securities has been investigated by the Securities and Exchange Commission ("SEC") and by the Commodities Futures Trading Commission ("CFTC") regarding a swap transaction with a party other than P & G. *In re BT Securities Corp.*, Release Nos. 33–7124, 34–35136 and CFTC Docket No. 95–3 (Dec. 22, 1994). Bankers Trust has agreed with the Federal Reserve Bank to a Consent Decree on its leveraged derivatives transactions.

At present, most derivatives transactions fall in "the common-law no-man's land beyond regulations—... interest-rate and equity swaps, swaps with embedded options ('swaptions')," and other equally creative financial instruments. Cohen, *The Challenge of Derivatives*, Vol. 63 Fordham L.Rev. at 2013. This is where the two highly specialized swap transactions involved in this case fall.

## III. The P & G/BT Swap Agreements

Those swaps transactions are governed by written documents executed by BT and P & G. BT and P & G entered into an Interest Rate and Currency Exchange Agreement on January 20, 1993. This standardized form, drafted by the International Swap Dealers Association, Inc. ("ISDA"), together with a customized Schedule and written Confirmations for each swap, create the rights and duties of parties to derivative transactions. By their terms, the ISDA Master Agreement, the Schedule, and all Confirmations form a single agreement between the parties.

During the fall of 1993, the parties began discussing the terms of an interest rate swap which was to be customized for P & G. After negotiations, the parties agreed to a swap transaction on November 2, 1993, which is referred to as the 5s/30s swap; the written Confirmation is dated November 4, 1993.

In the 5s/30s swap transaction, BT agreed to pay P & G a fixed rate of interest of 5.30% for five years on a notional amount of $200 million. P & G agreed to pay BT a floating interest rate. For the first six months, that floating rate was the prevailing commercial paper ("CP") interest rate minus 75 basis points (0.75%). For the remaining four-and-a-half years, P & G was to make floating interest rate payments of CP minus 75 basis points plus a spread. The spread was to be calculated at the end of the first six months (on May 4, 1994) using the following formula:

$$\text{Spread} = \frac{\left(98.5 * \frac{[5 \text{ year CMT}]}{5.78\%} - 30 \text{ T Price}\right)}{100}$$

In this formula, the "5 year CMT" (Constant Maturity Treasury) represents the yield on the five-year Treasury Note, and the "30 T Price" represents the price of the thirty-year Treasury Bond. The leverage factor in this formula meant that even a small movement up or down in prevailing interest rates results in an incrementally larger change in P & G's position in the swap.

The parties amended this swap transaction in January 1994; they postponed the date the spread was to be set to May 19, 1994, and P & G was to receive CP minus 88 basis points, rather than 75 basis points, up to the spread date.

In late January 1994, P & G and BT negotiated a second swap, known as the "DM swap", based on the value of the German Deutschemark. The Confirmation for this swap is dated February 14, 1994. For the first year, BT was to pay P & G a floating interest rate plus 233 basis points. P & G was to pay the same floating rate plus 133 basis points; P & G thus received a 1% premium for the first year, the effective

---

1. Estimates of the amount of usage of derivatives range from $14 trillion to $35 trillion in face or notional amounts. Cohen, *The Challenge of Derivatives*, Vol. 63 Fordham L.Rev. 1993 (1995).

2. *See* H.R. 31, 104th Cong. 1st Sess. (1995); H.R. 20, 104th Cong. 1st Sess. (1995); H.R. 4745, 103rd Cong.2d Sess. (1994).

dates being January 16, 1994 through January 16, 1995. On January 16, 1995, P & G was to add a spread to its payments to BT if the four-year DM swap rate ever traded below 4.05% or above 6.01% at any time between January 16, 1994, and January 16, 1995. If the DM swap rate stayed within that band of interest rates, the spread was zero. If the DM swap rate broke that band, the spread would be set on January 16, 1995, using the following formula:

Spread = 10 * [4–year DM swap rate − 4.50%]

The leverage factor in this swap was shown in the formula as ten.

P & G unwound both of these swaps before their spread set dates, as interest rates in both the United States and Germany took a significant turn upward, thus putting P & G in a negative position vis-a-vis its counterparty BT. BT now claims that it is owed over $200 million on the two swaps, while P & G claims the swaps were fraudulently induced and fraudulently executed, and seeks a declaratory verdict that it owes nothing.[3]

## IV. Federal Securities Claims (Counts VII and VIII)

In the 1933 Securities Act, Congress defined the term "security" as

any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferrable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or a certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or

warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(1). The definition section of the 1934 Act, 15 U.S.C. § 78c(a)(10), is virtually identical and encompasses the same instruments as the 1933 Act. *Reves v. Ernst & Young*, 494 U.S. 56, 61 n. 1, 110 S.Ct. 945, 949 n. 1, 108 L.Ed.2d 47 (1989).

P & G asserts that the 5s/30s and DM swaps fall within any of the following portions of that definition: 1) investment contracts; 2) notes; 3) evidence of indebtedness; 4) options on securities; and 5) instruments commonly known as securities.

Congress intended a broad interpretation of the securities laws and flexibility to effectuate their remedial purpose of avoiding fraud. *SEC v. Howey*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The United States Supreme Court has held, however, that Congress did not "intend" the Securities Acts "to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). The threshold issue presented by P & G's securities fraud claims is whether a security exists, *i.e.*, whether or not these swaps are among "the myriad financial transactions in our society that come within the coverage of these statutes." *Forman*, 421 U.S. at 849, 95 S.Ct. at 2059.

Economic reality is the guide for determining whether these swaps transactions that do not squarely fit within the statutory definition are, nevertheless, securities. *Reves*, 494 U.S. at 62, 110 S.Ct. at 949–50. In order to determine if these swaps are securities, commodities, or neither, I must examine each aspect of these transactions and subject them to the guidelines set forth in Supreme Court cases.

### A. Investment Contracts

█ For purposes of the federal securities laws, an "investment contract" is defined as "a contract, transaction or scheme whereby a person invests his money in a common enterprise." *Howey*, 328 U.S. at 298–99, 66 S.Ct. at 1102–03. Stated differently, the test whether an instrument is an investment contract is whether it entails "an investment in a

---

**3.** P & G seeks other relief, *i.e.*, punitive damages, attorney fees, and other costs.

common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060. The U.S. Court of Appeals for the Sixth Circuit has interpreted the *Howey* test as a "flexible one 'capable of adaptation or meeting the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.'" *Stone v. Kirk,* 8 F.3d 1079, 1085 (6th Cir. 1993), quoting *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103.

BT argues that the swaps are not investment contracts because 1) neither P & G nor BT invested any money; rather, they agreed to exchange cash payments at future dates; 2) the swaps did not involve an investment in a "common enterprise," which involves the pooling of funds in a single business venture, *Deckebach v. La Vida Charters, Inc. of Fla.,* 867 F.2d 278, 281 (6th Cir.1989); and 3) any gains to be derived from the swaps were not "profits," which are defined as "capital appreciation" or "participation in earnings" of a business venture. *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060; *Union Planters Nat'l Bank of Memphis v. Commercial Credit Business Loans, Inc.,* 651 F.2d 1174, 1185 (6th Cir.), *cert. den.* 454 U.S. 1124, 102 S.Ct. 972, 71 L.Ed.2d 111 (1981) (profits must be derived from the "managerial or entrepreneurial efforts of others"). BT contends that cash payments to be made arise not from the efforts of others, but from changes in U.S. and German interest rates.

P & G counters that the swaps are investments of money because an investment exists where an investor has committed its assets in such a way that it is subject to a financial loss and that the commitment to make future payments is sufficient to constitute an investment; further, that the swaps meet the "common enterprise" tests because its swaps, when combined with those of other parties, became part of the capital used to support BT's derivatives business. Specifically, P & G argues, BT combines its sales in one hedge book to offset all of its customers' transactions, and unwind prices reflect BT's overall portfolio risk. P & G further contends that its profit motive was its desire to reduce its overall interest costs and that it expected to derive profits from the efforts of BT in structuring and monitoring the swaps.

■ While the swaps may meet certain elements of the *Howey* test whether an instrument is an investment contract, what is missing is the element of a "common enterprise." P & G did not pool its money with that of any other company or person in a single business venture. How BT hedged its swaps is not what is at issue—the issue is whether a number of investors joined together in a common venture. Certainly, any counterparties with whom BT contracted cannot be lumped together as a "common enterprise." Furthermore, BT was not managing P & G's money; BT was a counterparty to the swaps, and the value of the swaps depended on market forces, not BT's entrepreneurial efforts. The swaps are not investment contracts.

**B. Notes or "Family Resemblance" to Notes**

BT asserts that the swaps are not notes because they did not involve the payment or repayment of principal. P & G responds that the counterparties incurred payment obligations that were bilateral notes or the functional equivalent of notes.

■ As with the test whether an instrument is an investment contract, these swap agreements bear some, but not all, of the earmarks of notes. At the outset, and perhaps most basic, the payments required in the swap agreements did not involve the payment or repayment of principal. *See Sanderson v. Roethenmund,* 682 F.Supp. 205, 206 (S.D.N.Y.1988) (promises to pay a specified sum of principal and interest to the payee at a specified time are to be analyzed as "notes" for the purposes of the Securities Acts).

■ In *Reves,* 494 U.S. at 64–67, 110 S.Ct. at 950–52, the Supreme Court set out a four-part "family resemblance" test for identifying notes that should be deemed securities. Those factors are: 1) the motivations of the buyer and seller in entering into the transaction (investment for profit or to raise capital versus commercial); 2) a sufficiently broad

plan of distribution of the instrument (common trading for speculation or investment); 3) the reasonable expectations of the investing public; and 4) whether some factor, such as the existence of another regulatory scheme, significantly reduces the risk of the instrument, thereby rendering application of the securities laws unnecessary.

In explaining the first prong of the "family resemblance" test, the Court in *Reves* distinguished between the motivations of the parties in entering into the transaction, drawing a line between investment notes as securities and commercial notes as non-securities. The Court said:

> If the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a "security." If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good, to correct for the seller's cash-flow difficulties, or to advance some other commercial or consumer purpose, on the other hand, the note is less sensibly described as a "security."

*Reves,* 494 U.S. at 66, 110 S.Ct. at 951–52.

There is no "neat and tidy" way to apply this prong of the test, in part because P & G and BT were counterparties, not the typical buyer and seller of an instrument. BT's motive was to generate a fee and commission, while P & G's expressed motive was, in substantial part, to reduce its funding costs. These motives are tipped more toward a commercial than investment purpose. As to P & G, there was also an element of speculation driving its willingness to enter a transaction that was based on its expectations regarding the path that interest rates would take. Thus, this prong of the *Reves* test, standing alone, is not a sufficient guide to enable one to make the determination whether the 5s/30s and DM swaps were notes within the meaning of the Securities Acts.

The second prong of the *Reves* test examines the plan of distribution of the instrument "to determine whether it is an instrument in which there is 'common trading for speculation or investment.'" *Id.,* quoting

*SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 123–24, 88 L.Ed. 88 (1943). While derivatives transactions in general are an important part of BT's business, and BT advertises its expertise in putting together a variety of derivatives packages, the test is whether the 5s/30s and DM swaps in particular were widely distributed. These swaps are analogous to the notes that were held not to be securities on the basis that the plan of distribution was "a limited solicitation to sophisticated financial or commercial institutions and not to the general public." *Banco Español de Credito v. Security Pacific Nat'l Bank,* 763 F.Supp. 36, 43 (S.D.N.Y.1991), *aff'd* 973 F.2d 51 (2d Cir. 1992). The 5s/30s and DM swaps were customized for Procter & Gamble; they could not be sold or traded to another counterparty without the agreement of BT. They were not part of any kind of general offering.

Thus, I conclude that the 5s/30s and DM swaps were not widely distributed and do not meet the second prong of the *Reves* test.

Application of the third *Reves* factor—the public's reasonable perceptions—does not support a finding that these swap agreements are securities. They were not traded on a national exchange, "the paradigm of a security." *Reves,* 494 U.S. at 69, 110 S.Ct. at 953. I recognize that some media refer to derivatives generally as securities and that some commentators assume that all derivatives are securities. Other commentators understand that many swap transactions are customized, bilateral contracts not subject to regulation. Cohen, 63 Fordham L.Rev. at 2013. However, what is relevant is the perception of those few who enter into swap agreements, not the public in general. P & G knew full well that its over-the-counter swap agreements with BT were not registered with any regulatory agency. P & G's "perception" that these swap agreements were securities did not surface until after it had filed its original Complaint in this case.

Thus, I conclude that the 5s/30s and DM swaps do not meet the third prong of the *Reves* test.

The fourth *Reves* factor is whether another regulatory scheme exists that would control

and thus reduce the risk of the instrument, making application of the securities laws unnecessary. At about the time these swaps were entered into, the guidelines of the Office of the Comptroller of Currency ("OCC") and the Federal Reserve Board went into effect. OCC Banking Circular 277, *Risk Management of Financial Derivatives,* Fed.Banking L.Rep. (CCH) ¶ 62,154, at 71,-703 (Oct. 27, 1993); Federal Reserve Board Supervisory Letter SR 93–69, *Examining Risk Management and Internal Controls for Trading Activities of Banking Organizations,* Fed.Banking L.Rep. ¶ 62–152, at 71,-712 (Dec. 20, 1993); OCC Bulletin 94–31, *Questions and Answers for BC–277: Risk Management of Financial Derivatives,* Fed.Banking L.Rep. ¶ 62–152, at 71,719 (May 10, 1994).

While these guidelines are useful in regulating the banking industry, their focus is the protection of banks and their shareholders from default or other credit risks. They do not provide any direct protection to counterparties with whom banks enter into derivatives transactions. While the 5s/30s and DM swaps may meet this prong of the *Reves* "family resemblance" test, this is not enough to bring these transactions within the statutory definition of a "note" for purposes of the securities laws.

Balancing all the *Reves* factors, I conclude that the 5s/30s and DM swaps are not notes for purposes of the Securities Acts.

### C. Evidence of Indebtedness

P & G argues that if the swaps are not notes, they are evidence of indebtedness because they contain bilateral promises to pay money and they evidence debts between the parties. It argues that the counterparties promised to pay a debt, which consists of future obligations to pay interest on the notional amounts. Indeed, BT now claims that it is owed millions of dollars on the swaps. P & G points out that the phrase "evidence of indebtedness" in the statute must have a meaning other than that given to a "note" so that the words "evidence of indebtedness"

are not redundant. Thus, it argues, without citation to authority, that if the swaps are not notes, then they should be construed as an evidence of indebtedness "either because they may contain terms and conditions well beyond the typical terms of a note and beyond an ordinary investor's ability to understand, or because the debt obligation simply does not possess the physical characteristics of a note."

The test whether an instrument is within the category of "evidence of indebtedness" is essentially the same as whether an instrument is a note. *Holloway v. Peat, Marwick, Mitchell & Co.,* 879 F.2d 772, 777 (10th Cir. 1989), *judgment vacated on other grounds sub nom. Peat Marwick Main Co. v. Holloway,* 494 U.S. 1014, 110 S.Ct. 1314, 108 L.Ed.2d 490 (1990), *reaff'd on remand,* 900 F.2d 1485 (10th Cir.), *cert. den.* 498 U.S. 958, 111 S.Ct. 386, 112 L.Ed.2d 396 (1990) (passbook savings certificates and thrift certificates were analyzed under the "note" or "evidence of indebtedness" categories, as they represented a promise to repay the principal amount, plus accrued interest); *In re Tucker Freight Lines, Inc.,* 789 F.Supp. 884, 885 (W.D.Mich.1991) (The Court's "method [in *Reves* ] seems applicable to all debt instruments, including evidences of indebtedness.").

I do not accept P & G's definition of "evidence of indebtedness" in large part because that definition omits an essential element of debt instruments—the payment or repayment of principal. Swap agreements do not involve the payment of principal; the notional amount never changes hands.

### D. Options on Securities

An option is the right to buy or sell, for a limited time, a particular good at a specified price.

■ Five-year notes and thirty-year Treasury bonds are securities; therefore, P & G contends that the 5s/30s swap is an option on securities.[4] It argues that because the 5s/30s swap spread was based on the value of these

---

4. P & G does not contend that the DM swap was an option on a security for purposes of the 1933 and 1934 Acts. Indeed, the underlying instrumentality of the DM swap was not a security, because the value of the DM swap was based on a foreign currency, which is not a security as defined in the 1933 and 1934 Acts.

securities, it falls within the statutory definition: "any put, call, straddle, option or privilege on any security, group or index of securities (including any interest therein or based on the value thereof)." It describes the 5s/30s swap as "a single security which can be decomposed into a plain vanilla swap with an embedded put option. The option is a put on the 30–year bond price with an uncertain strike price that depends on the level of the 5–year yield at the end of six months."

■ BT contends that the 5s/30s swap is not an option because no one had the right to take possession of the underlying securities. BT argues that although both swaps contained terms that functioned as options, they were not options because they did not give either party the right to sell or buy anything. According to BT, the only "option-like" feature was the spread calculation that each swap contained; that any resemblance the spread calculations had to options on securities does not extend to the underlying swaps themselves, which had no option-like characteristics. I agree that the 5s/30s swap was not an option on a security; there was no right to take possession of any security.

The definition of a "security" in the 1933 and 1934 Acts includes the parenthetical phrase "(including any interest therein or based on the value thereof)," which could lead to a reading of the statute to mean that an option based on the value of a security is a security. Legislative history, however, makes it clear that that reading was not intended. The U.S. House of Representatives Report ("House Report") on the 1982 amendments that added this parenthetical phrase provides that the definition of "security" includes an option on "(i) any security, (ii) any certificate of deposit, (iii) any group or index of securities (including any interest therein or based on the value thereof), and (iv) when traded on a national securities exchange, foreign currency." H.R.Rep. No. 626, 97th Cong., 2d Sess., pt. 2, at 4 (1982), *reprinted in* 1982 U.S.C.C.A.N. 2780, 2795. Thus, even though the statute jumbles these definitions together, it is clear from the House Report that the parenthetical phrase "( ... based on the value thereof)" was intended only to modify the immediately preceding clause—"group or index of securities"—and not the words "any option" or "any security."

Two Orders by the Security and Exchange Commission must be considered. These rulings involve transactions between BT and Gibson Greetings, Inc. in swaps that have some similarities to the 5s/30s swap. *In re BT Securities Corp.,* Release Nos. 33–7124, 34–35136 (Dec. 22, 1994), and *In the Matter of Mitchell A. Vazquez,* Release Nos. 33–7269, 34–36909 (Feb. 29, 1996). In these cases, the SEC ruled that a "Treasury–Linked Swap" between BT and Gibson Greetings, Inc. was a security within the meaning of the federal securities laws. The SEC stated: "While called a swap, the Treasury–Linked Swap was in actuality a cash-settled put option that was written by Gibson and based initially on the 'spread' between the price of the 7.625% 30–year U.S. Treasury maturity maturing on November 15, 2022 and the arithmetic average of the bid and offered yields of the most recently auctioned obligation of a two-year Treasury note."

■ These SEC Orders were made pursuant to Offers of Settlement made by BT Securities and Vazquez. In both Orders, the SEC acknowledged that its findings were solely for the purpose of effectuating the respondents' Offers of Settlement and that its findings are not binding on any other person or entity named as a defendant or respondent in any other proceeding. They are not binding in this case, in part because of the differences between the transactions; nor do they have collateral estoppel effect. *See also SEC v. Sloan,* 436 U.S. 103, 118, 98 S.Ct. 1702, 1711–12, 56 L.Ed.2d 148 (1978) (citations omitted) (The "courts are the final authorities on the issues of statutory construction and are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.").

Even though both the Gibson Greetings, Inc. swap and the P & G 5s/30s swap derived their values from securities (Treasury notes), they were not options. While these swaps

included option-like features, there is a missing essential element of an option. These swaps were exchanges of interest payments; they did not give either counterparty the right to exercise an option or to take possession of any security. Neither party could choose whether or not to exercise an option; the stream of interest payments under the swap was mandatory. Consequently, I conclude that the 5s/30s swap is not an option on a security or an option based on the value of a security.

### E. Instruments Commonly Known as Securities

Finally, P & G contends that both the 5s/30s and the DM swaps are securities simply because that is how these instruments were offered and how they have become known through a course of dealing. In support of this position, P & G points to the SEC Orders in the Gibson Greetings matter and asserts that BT labels leveraged derivatives as investments, speculative, and options; and that the financial markets and the media characterize derivatives as securities.

The Supreme Court uses the *Howey* test for both "investment contracts" and the more general category of an "instrument" commonly known as a "security." *Landreth Timber Co. v. Landreth,* 471 U.S. 681, 691 n. 5, 105 S.Ct. 2297, 2304 n. 5, 85 L.Ed.2d 692 (1985); *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060 ("We perceive no distinction, for present purposes, between an 'investment contract' and an 'instrument' commonly known as a 'security.'" In either case, "the basic test for distinguishing the transaction from other commercial dealings is 'whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.'" *Howey,* 328 U.S. at 301, 66 S.Ct. at 1104).

Even before the *Howey* decision, the Supreme Court established a contextual connection between an "investment contract" and "instrument commonly known as a 'security'" in *Joiner Leasing,* 320 U.S. at 351, 64 S.Ct. at 123–24, where the Supreme Court stated:

> In the Securities Act the term "security" was defined to include by name or description many documents in which there is common trading for speculation or investment. Some, such as notes, bonds, and stocks, are pretty much standardized and the name alone carries well-settled meaning. Others are of more variable character and were necessarily designated by more descriptive terms, such as "transferable share," "investment contract," and "in general any interest or instrument commonly known as a security." We cannot read out of the statute these general descriptive designations merely because more specific ones have been used to reach some kinds of documents. Instruments may be included within any of these definitions, as matter of law, if on their face they answer to the name or description. However, the reach of the Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as a matter of fact that they are widely offered or dealt in under terms or courses of dealing which established their character in commerce as "investment contracts," or as "any interest or instrument commonly known as a 'security.'"

While neither *Joiner Leasing,* nor *Landreth,* nor *Forman* dealt with instruments comparable to the leveraged derivatives involved in this case, the reasoning of the Supreme Court is applicable. In each of these cases, the Court emphasized that when a party seeks to fit financial instruments into the non-specific categories of securities, those instruments must nevertheless comport with the *Howey* test, which "embodies the essential attributes that run through all of the Court's decisions defining a security. The touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others." *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060.

In determining whether the 5s/30s and DM swaps are instruments commonly known as securities, P & G's own pleadings are telling in defining how P & G viewed these transactions. In recent motions, P & G asserts that it knew of the alleged fraud in the 5s/30s swap in mid-April 1994. Yet, P & G did not

bring securities claims when it filed its original Complaint in October 1994. P & G did not assert a claim for securities violations until January 1995, after the SEC and CFTC issued their rulings in the Gibson Greetings matter. If P & G itself had really thought it was dealing with securities, it is fair to assume that P & G would have included securities counts in its original Complaint.

In any event, the contracts between P & G and BT do not meet the *Howey* criteria, particularly because there is no way that they can be construed to be a pooling of funds in a common enterprise. These swaps do not qualify as securities.

It is important to point out that the holdings in this case are narrow; I do not determine that all leveraged derivatives transactions are not securities, or that all swaps are not securities. Some of these derivative instruments, because of their structure, may be securities. I confine my ruling to the 5s/30s and the DM swaps between P & G and BT.

## V. Ohio Securities Laws Claims (Counts IX—XI)

 Ohio's Blue Sky law, Ohio Rev.Code § 1707.01(B) (1992) defines "security" in pertinent part as follows:

> any certificate or instrument that represents title to or interest in ... the capital, assets, profits, property, or credit of any person or of any public or governmental body, subdivision, or agency. It includes ... warrants or options to purchase securities, promissory notes, all forms of commercial paper, evidences of indebtedness, ... any investment contract, any instrument evidencing a promise or an agreement to pay money, ... and the currency of any government other than those of the United States or Canada, ...

Ohio's test for an investment contract is somewhat broader than the *Howey* test set out by the United States Supreme Court. *State v. George*, 50 Ohio App.2d 297, 362 N.E.2d 1223, 1227 (Ohio App.1975). Under Ohio law, an investment contract is created whenever:

(1) An offeree furnishes initial value to an offeror,

(2) A portion of the initial value is subjected to the risks of the enterprise,

(3) The furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and

(4) The offeree does not receive the right to exercise practical and actual control over managerial decisions of the enterprise.

*Deckebach*, 867 F.2d at 284 (construing Ohio law), citing *George*, 362 N.E.2d at 1227. Even though this test may be broader than the *Howey* test, Ohio law still requires a finding of common enterprise. The Ohio Supreme Court stated:

> The question ... is whether it appears that the contributed sums would reasonably find their way into the general operations of the enterprise. Stated another way, it is whether such investment will become a part of the capital pool used to conduct the business being promoted by the offeror. If so, such initial value furnished by the offeree may be considered as risk capital of the enterprise.

*George*, 362 N.E.2d at 1228.

 P & G continues to argue that the "enterprise" in its swap transactions was BT's general derivatives operations and the hedging connected with that part of its business. This argument misses the point—the funds invested must be used in the venture being promoted. *Id.* P & G was not investing in BT's business, nor was BT offering P & G profits from its derivatives business. How BT hedged its swaps, whether individually or on a portfolio basis is immaterial to whether P & G would profit or lose in its swaps. P & G knew that the performance of the swaps was wholly dependent on the value of Treasury notes and bonds and the German Deutschemark. P & G's fate on its swaps was not dependent on how well or how poorly BT hedged those swaps. Thus, P & G's swaps were not part of BT's enterprise. Because that element is missing in the 5s/30s and DM swaps, they are not securities under

the "investment contract" provision of the Ohio Blue Sky laws.

 The Ohio statute contains a provision that the federal law does not have—"any instrument evidencing a promise or an agreement to pay money." P & G argues that the Sixth Circuit decision in *Riedel v. Bancam, S.A.*, 792 F.2d 587 (6th Cir.1986), applies to this issue. In that case, Judge Kennedy held that certificates of deposit issued by a Mexican bank were not securities under the federal securities laws, but would fall within the definition of "security" under the "broadly drafted" Ohio law covering "evidences of indebtedness" and "any instrument evidencing a promise or an agreement to pay money." *Id.* at 593–594.

While reinforcing the premise that Ohio's securities laws are broadly written, the *Riedel* case is not binding here. Swaps are not certificates of deposit; they are bilateral promises to pay in the future, the amount of which would depend on the rise or fall of the market. Such promises to pay are not securities under Ohio law. *See Emery v. So–Soft of Ohio, Inc.*, 199 N.E.2d 120, 125 (Ohio App.1964) (agreement to pay fee for each referral of customer that resulted in the sale of a water conditioner was not a security; "the agreement contained a promise to pay money, but so do most salesmen's commission and employment contracts." This unilateral contract was merely an offer to pay for the performance of certain acts).

If one were to interpret the phrase "instruments evidencing a promise or an agreement to pay money" as broadly as P & G asks, this classification would mean that every private agreement to pay money, including such things as charge slips that customers sign for credit card purchases, would fall within the securities laws. This is not the legislative intent. Rather, one must look to the broader perspective and the requirement of the first sentence of § 1701.01(B) that the security instrument must represent an interest in the capital, assets, profits, property or credit of the party issuing the instrument. Interest rate swaps do not embody any of these indices of a security.

 Finally, P & G contends that the DM swap is a security because the Ohio definition of a security includes "the currency of any government other than those of the United States and Canada." P & G cites no authority for the proposition that the DM swap, whose value was tied to the four-year German swap rate, was the equivalent of German currency. The DM swap entitled no one to any amount of German currency; the DM transaction was an interest rate swap, not a currency swap, and thus does not come within this aspect of the Ohio definition of a security.

Therefore, Counts IX, X, and XI are dismissed; the swaps are not within the definition of a "security" in Ohio law, and the parties' agreement precludes application of Ohio law (*see* Section VII below).

## VI. Commodities (Counts XII—XIV)

The Commodity Exchange Act ("CEA") includes in its definition of a commodity "all services, rights, and interests in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a(3). BT asserts that the swaps are not futures contracts; P & G claims that they are.

Under the CEA, The Commodity Futures Trading Commission has exclusive jurisdiction over "accounts, agreements ... and transactions involving contracts of sale of a commodity for future delivery traded or executed on a contract market ... or any other board of trade, exchange, or market, and transactions [in standardized contracts for certain commodities]." As of January 19, 1996, the CFTC had "not taken a position on whether swap agreements are futures contracts." Letter from Mary L. Schapiro, Chair of U.S. Commodity Futures Trading Commission to Congressmen Roberts and Bliley, p. 4 (Jan. 19, 1996). This opinion does not decide that issue because the 5s/30s and DM swaps are within the Swaps Exemption to the CEA and because P & G has not stated a claim under § 4b, § 4o, or 17 C.F.R. § 32.9, as discussed below.

### A. Swaps Exemption

 Even if the 5s/30s and DM swaps are defined as commodities, swap agree-

ments are exempt from all but the antifraud provisions of the CEA under the CFTC Swap Exemption. Title V of the Futures Trading Practices Act of 1992 granted the CFTC the authority to exempt certain swaps transactions from CEA coverage. 7 U.S.C. § 6(c)(5).

In response to this directive, on January 22, 1993, the CFTC clarified its July 1989 safe-harbor policy regarding swap transactions[5] in order to "promote domestic and international market stability, reduce market and liquidity risks in financial markets, including those markets (such as futures exchanges) linked to the swap market, and eliminate a potential source of systemic risk. To the extent that swap agreements are regarded as subject to the provisions of the Act, the rules provide that swap agreements which meet the terms and conditions [of the rules] are exempt from all provisions of the Act, except section 2(a)(1)(B)." *Exemption for Certain Swap Agreements,* 58 Fed.Reg. 5587, 5588 (Jan. 22, 1993).

To qualify for exemption, a transaction must fit within the CFTC's definition and meet four criteria. The CFTC defines a "swap agreement" as

(i) An agreement (including terms and conditions incorporated by reference therein) which is a rate swap agreement, basis swap, forward rate agreement, commodity swap, interest rate option, forward foreign exchange agreement, rate cap agreement, rate floor agreement, rate collar agreement, currency swap agreement, cross-currency rate swap agreement, currency option, any other similar agreement (including any option to enter into any of the foregoing);

(ii) Any combination of the foregoing; or

(iii) A master agreement for any of the foregoing together with all supplements thereto.

17 C.F.R. § 35.1(b) (1993). The 5s/30s and DM swaps fit within this definition.

The four criteria for exemption are: 1) The swap must be entered into solely between "eligible swap participants;" 2) the swap may not be part of a fungible class of agreements standardized as their material economic terms; 3) counterparty creditworthiness is a material consideration of the parties in entering into the swap agreement; and 4) the swap is not entered into and is not traded on or through an exchange market. 17 C.F.R. § 35.2 (1993).

The 5s/30s and DM swaps meet these criteria. First, the definition of "eligible swap participants" in 17 C.F.R. § 35.1(b)(2) includes a "bank or trust company (acting on its own behalf or on behalf of another eligible swap participant)" and corporations with total assets exceeding $10,000,000. BT and P & G are within this definition. Second, these swaps are customized and not fungible as they could not be sold to another counterparty without permission. Third, creditworthiness is a consideration of the parties. Fourth, the swaps are private agreements not traded on any exchange.

While exempting qualified swap agreements from CEA requirements such as trading only on an exchange, the CFTC specifically reserved the antifraud provisions in Sections 4b and 4o of the Act and Commission Rules 32.9, 17 C.F.R. § 32.9 (1992):

A swap agreement is exempt from *all* provisions of the Act and any person or class of persons offering, entering into, rendering advice, or rendering other services with respect to such agreement, is exempt for such activities from *all* provisions of the Act (*except* in each case the provisions of sections 2(a)(1)(B), 4b, and 4o of the Act and § 32.9 of this chapter....)

*Id.* (emphasis added).

Thus, even if the 5s/30s and DM swaps are exempt from other provisions of the CEA,

---

**5.** The CFTC identified those swap transactions that would not be regulated as futures or commodity options transactions under the CEA to include those that had 1) individually-tailored terms; 2) an absence of exchange-style offset; 3) an absence of a clearing organization or margin system; 4) limited distribution with the transaction undertaken in conjunction with the parties' lines of business, thus precluding public participation; and 5) a prohibition against marketing to the public. *Policy Statement Concerning Swap Transactions,* 54 Fed.Reg. 30,694 (July 21, 1989).

they may be subject to the antifraud provisions (§ 4b and § 4o).

### B. Violation of Section 4b (Count XII)

■ Section 4b of the Commodity Exchange Act, 7 U.S.C. § 6b(a), makes it "unlawful ... (2) for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, made, or to be made, for or on behalf of any other person ..." to engage in certain fraudulent conduct.

BT asserts that Count XII, alleging a violation of Section 4b, should be dismissed because BT did not act "for or on behalf of" P & G. Rather, BT "acted solely as a principal, dealing with—not for—P & G on an arm's length basis."

P & G contends that BT's advertisements and representations are promises that BT would use its experience, sophistication and expertise on behalf of its clients to advise them in the complex financial area of leveraged derivatives. P & G relies on Judge Friendly's decision in *Leist v. Simplot,* 638 F.2d 283 (2d Cir.1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982). Judge Friendly noted, "None of the cases recognizing an implied right of action under § 4b suggest limitation to the broker-customer relation." *Id.* at 322. Thus, P & G argues that the *Leist* decision expanded the implied right of action under § 4b to claims of fraud well beyond one who acts for or on behalf of another in the customer-broker situation. Indeed, the defendant in *Leist* was the New York Mercantile Exchange, and the U.S. Supreme Court in *Curran* did permit a private action against that entity; however, the Court in *Curran* did not create a blanket private right of action under § 4b or delete the requirement that the transaction must be conducted "for or on behalf of" the defrauded party. *See ACLI International Commodity Services, Inc. v. Banque Populaire Suisse,* 550 F.Supp. 144, 145 (S.D.N.Y.1982) ("Unless the statute's plain language is to be ignored, a § 4b plaintiff must allege fraud in a commod-

ities transaction conducted for himself, or on his own behalf."); *but see Apex Oil Co. v. DiMauro,* 641 F.Supp. 1246, 1286 (S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds,* 822 F.2d 246 (2d Cir.1987), *cert. den.* 484 U.S. 977, 108 S.Ct. 489, 98 L.Ed.2d 487 (in dicta, the district court stated that Judge Friendly's "expansive" interpretation of § 4b encompasses "brokered transactions between longs and shorts so as to hold principals accountable to each other").

I conclude that BT was not acting for or on behalf of P & G as that relationship is generally construed in the customer-broker context. As counterparties, P & G and BT were principals in a bilateral contractual arrangement.[6] This is not to say that BT had no duties to P & G. Those duties are set out in Section VIII. below. However, P & G has no private right of action under § 4b.

### C. Violation of Section 4o (Count XIII)

■ Section 4o, 7 U.S.C. § 6o, provides:

(1) It shall be unlawful for a commodity trading advisor ... by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly—

(A) to employ any device, scheme or artifice to defraud any client or participant or prospective client or participant; or

(B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or participant or prospective client or participant.

In *Jarrett v. Kassel,* 972 F.2d 1415 (6th Cir.1992), *cert. den.* 507 U.S. 916, 113 S.Ct. 1272, 122 L.Ed.2d 667 (1993), the Sixth Circuit applied the holding in *Curran* to § 4o claims. The court in *Jarrett* held that, just as there is a private right of action under § 4b for an investor defrauded by his broker, there is an implied private right of action under § 4o against commodity trading advisors and commodity pool operators. *Id.* at 1423. The question is whether BT was P & G's commodity trading advisor.

---

**6.** In *West Virginia v. Morgan Stanley & Co.,* 459 S.E.2d 906, 913 (1995), the Supreme Court of Appeals of West Virginia noted in a case involving derivatives transactions that as a counterparty, Morgan Stanley was a "principal in the transactions at stake, not a broker."

In 7 U.S.C. § 1a(5)(A), the CEA defines "commodity trading advisor" as: any person who

(i) for compensation or profit, engages in the business of advising others, either directly or through publications, writing, or electronic media, as to the value of or the advisability of trading in—

(I) any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market;

(II) any commodity option authorized under section 6c of this title; or

(III) any leverage transaction authorized under section 23 of this title; or

(ii) for compensation or profit, and as part of a regular business, issues or promulgates analyses or reports concerning any of the activities referred to in clause (i).

Section (I) of the definition does not apply because the 5s/30s swaps were not traded on any contract market and are not subject to the rules of any contract market under the Swaps Exemption. Section (II) refers to commodity options authorized under section 6c. This provision prohibits all option trading in commodities unless authorized by CFTC rules. 7 U.S.C. § 6c. Because of the Swaps Exemption, swaps are specifically exempt from CFTC rules. Thus, Section (II) may not be applicable. Section (III) does not apply, because the 5s/30s and DM swaps do not fit within the CFTC's regulations for leverage contracts referred to in 7 U.S.C. § 23(a).[7]

A commodity trading advisor is one who is "in the business of advising others on the value or advisability of trading in the purchase or sale of futures contracts or options" or as an "investment adviser." *F.D.I.C. v. Hildenbrand,* 892 F.Supp. 1317, 1324–25

(D.Colo.1995). I recognize that representatives from BT Securities had conversations with P & G regarding market conditions, past performance of Treasury notes and bonds, prognostications for the future, and the like. There is also evidence that these representatives gave P & G a sales pitch regarding the potential benefits of their product. These representatives also discussed P & G's view of interest rates. Thus, while BT Securities representatives came close to giving advice,[8] P & G representatives used their own independent knowledge of market conditions in forming their own expectation as to what the market would do in the 5s/30s and DM swaps. That expectation (central to the two swaps) was not based on commodity trading advice. That expectation was clearly P & G's sole decision. Thus, P & G's claims in Count XIII are dismissed.

### D. Violation of 17 C.F.R. § 32.9 (Count XIV)

Section 32.9 of the CFTC Rules, 17 C.F.R. § 32.9, provides:

It shall be unlawful for any person directly or indirectly:

(a) To cheat or defraud or attempt to cheat or defraud any other person;

(b) To make or cause to be made to any other person a false report or statement thereof . . .;

(c) To deceive or attempt to deceive any other person by any means whatsoever;

in or in connection with an offer to enter into, the entry into, or the confirmation or the execution of, any commodity option transaction.

BT argues that there is no private right of action under the CFTC Rules. Courts are divided on this question. Among those cases finding no such private right of action are

---

7. *See* 17 C.F.R. § 31.4(w) (leverage contracts must be for ten years or longer).

8. In response to an Offer of Settlement, the CFTC entered an Order against BT Securities on December 22, 1994, with regard to an unspecified OTC derivative transaction with Gibson Greetings, Inc. *In re BT Securities Corporation,* CFTC Docket No. 95–2 (Dec. 22, 1994). The CFTC indicated that the facts were sufficient to show that BT Securities had an advisory relationship with Gibson. Apparently, Gibson did not understand the ramifications of the transaction, and BT Securities was aware of that lack of financial sophistication. As with the SEC Consent Order, the CFTC Order provides: "These findings are not binding on any other person or entity named as a defendant or respondent in any other proceeding." Thus, while an indicator that the CFTC viewed BT Securities as a commodity trading advisor as to Gibson, the CFTC's Order is not binding here.

*Khalid Bin Alwaleed Foundation v. E.F. Hutton Co., Inc.,* 709 F.Supp. 815, 820 (N.D.Ill.1989) ("Congress did not intend private rights of action for violations of CFTC rules."); *Fustok v. ContiCommodity Services Inc.,* 618 F.Supp. 1069, 1073–73 (S.D.N.Y. 1985) ("[W]e find nothing in the legislative history which indicates that Congress intended the rights of the CFTC and the rights of investors to be identical;" thus, plaintiff may not maintain an action based solely on violation of a CFTC Rule.); *see also Davis v. Coopers & Lybrand,* 787 F.Supp. 787, 799 (N.D.Ill.1992) ("Plaintiffs effectively concede ... that with certain inapplicable exceptions the exclusive private remedy under CEA § 22 does not include a cause of action for violation of CFTC Regulations."); *In re ContiCommodity Services Inc., Securities Lit.,* 733 F.Supp. 1555, 1568 (N.D.Ill.1990) ("Claims for violation of CFTC regulations can only be pursued in reparation proceedings under § 14 of the CEA [7 U.S.C. § 18], not in civil actions for damages pursuant to § 22.").

Cases implicitly finding a private right of action for violation of CFTC Rules are the following: *Irvine v. Cargill Investor Services, Inc.,* 799 F.2d 1461, 1462 n. 3 (11th Cir.1986) ("[T]here probably is a [private cause of action under CFTC regulations] ..."); *Point Landing Inc. v. Omni Capital Int'l, Ltd.,* 795 F.2d 415, 418 n. 4 (5th Cir. 1986), *aff'd sub nom. Omni Capital Int'l Ltd. v. Rudolf Wolff & Co., Ltd.,* 484 U.S. 97, 108 S.Ct. 404, 98 L.Ed.2d 415 (1978) ("Transactions on the London Metals Exchange have been held outside the scope of § 4c(b) of the CEA. The plaintiffs' claims may, however, be cognizable under § 4c(b) of the Act, 7 U.S.C. § 6c(b) and Regulation 32.9, 17 C.F.R. § 32.9, or under Regulation 30.02, 17 C.F.R. § 30.02." (citations omitted)). These cases are hardly a ringing endorsement of a private cause of action under the CFTC Regulations.

The better reasoned rule of law is that § 32.9 is applicable only to CFTC enforcement actions and does not give rise to a private cause of action for violation of that Regulation. Therefore, Count XIV of P & G's Second Amended Complaint is dismissed.

## VII. Ohio Deceptive Trade Practices Act (Count XV)

The Ohio Deceptive Trade Practices Act, Ohio Rev.Code § 4165.02, provides:

A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he ...

(E) Represents that goods or services have ... characteristics, ... uses, benefits or quantities ... that they do not have ...;

(G) Represents that goods or services are of a particular standard, quality, or grade ..., if they are of another.

■ This claim is dismissed because of the mandate in the contract. The ISDA Master Agreement provides in Section (1) of Part 4 of the Schedule:

Governing Law. This Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of New York without reference to choice of law doctrine.

The inclusion of the phrase "without reference to choice of law doctrine" forecloses the application of Ohio law.

In *Turtur v. Rothschild Registry Int'l., Inc.,* 26 F.3d 304, 309 (2d Cir.1994), the court considered the following choice of law provision:

This note shall be governed by, and interpreted under, the laws of the State of New York applicable to contracts made and to be performed therein without giving effect to the principles of conflict of laws. The parties hereto consent to the exclusive jurisdiction of the courts of the State of New York to resolve any controversy or claim arising out of or relating to this contract or breach thereof.

The U.S. Court of Appeals for the Second Circuit enforced the parties' agreement to be bound by their choice of law provision, without regard to conflict of laws principles, and applied New York law to the fraud claim that arose out of or related to their contract. *Id.* at 310.

Relying on *Turtur,* the U.S. District Court for the Southern District of New York con-

strued a similar provision in an ISDA Master Agreement. *P.T. Adimitra Rayapratama v. Bankers Trust Co.*, 1995 WL 495634 1995 U.S.Dist. LEXIS 11961; Comm.Fut.L.Rep. (CCH) P26,508 (S.D.N.Y.1995). This ISDA Agreement was governed by English Law, which does not recognize RICO (Racketeer Influenced Corrupt Organizations Act) and commodities laws claims under U.S. statutes, and the court accordingly dismissed plaintiff's statutory claims.

Similarly, the U.S. Court of Appeals for the Sixth Circuit dismissed claims of violation of Alabama statutes where the contract was to be governed by Michigan law. *Moses v. Business Card Express, Inc.*, 929 F.2d 1131, 1139–40 (6th Cir.), *cert. den.* 502 U.S. 821, 112 S.Ct. 81, 116 L.Ed.2d 54 (1991).

The reasoning in these cases applies here. The parties consented to be bound by New York statutes and caselaw, without regard to any choice of law doctrine. Therefore, there is no claim under Ohio statutes, and Count XV is dismissed.

## VIII. The Duties and Obligations of the Parties

 P & G contends that a fiduciary relationship existed between it and BT. It argues that it agreed to the swap transactions because of a long relationship it had with BT and the trust that it had in BT, plus the assurance that BT would take on the responsibility of monitoring the transactions and that BT would look out for its interests.

P & G points to its trust in BT in that it divulged confidential corporate information to BT. By entering into complex swaps transactions with BT, which represented itself as experts in such transactions, P & G relied on that expertise and BT statements that it would tailor the swaps to fit P & G's needs. Even accepting these contentions as true, these contentions fail. New York caselaw is clear.

In *Beneficial Commercial Corp. v. Murray Glick Datsun, Inc.*, 601 F.Supp. 770, 772 (S.D.N.Y.1985) that law is summarized with case citations as follows:

New York law is clear that a fiduciary relationship exists from the assumption of control and responsibility and is founded upon trust reposed by one party in the integrity and fidelity of another. No fiduciary relationship exists ... [where] the two parties were acting and contracting at arm's length. Moreover, courts have rejected the proposition that a fiduciary relationship can arise between parties to a business relationship.

P & G and BT were in a business relationship. They were counterparties. Even though, as I point out hereafter, BT had superior knowledge in the swaps transactions, that does not convert their business relationship into one in which fiduciary duties are imposed. Thus, I grant summary judgment on Count IV in favor of BT.

This does not mean, however, that there are *no* duties and obligations in their swaps transactions.

Plaintiff alleges that in the negotiation of the two swaps and in their execution, defendants failed to disclose vital information and made material misrepresentations to it. For these reasons plaintiff has refused to make any payments required by the swaps transactions to defendants. Plaintiff requests that a jury verdict should declare that it owes nothing to defendants. Put another way, the damage which plaintiff claims is the amount of money it would have to pay to defendants if the jury verdict is against its position.

Since plaintiff's Amended Complaint is based on allegations of defendants' fraud and material misrepresentations, I must determine what the duties and obligations of the parties are to each other.

This requires 1) an analysis of the written contracts between the parties, *i.e.*, the International Swap Dealers Association ("ISDA") Agreement of January 20, 1993, the Schedule and Definitions appended to it, and the detailed Confirmations as to each swap; 2) the statutes and caselaw of New York (the parties in the ISDA Agreement and Part 4 of the Schedule, having contracted that "[t]his Agreement will be governed by, and construed and enforced in accordance with, the laws of the State of New York without reference to choice of law doctrine"); and 3) the Uniform Commercial Code as well as the

*Restatement (Second) Contracts,* the Code having been made a part of New York statutory law and the principles of the *Restatement* having been accepted by New York courts.

I note, at the outset, that plaintiff's complaint does not clearly state a cause of action based on breach of contract; plaintiff rather alleges fraudulent conduct and material misrepresentation, and alludes to this as tortious wrong. I recognize that plaintiff can put in its proofs on either basis.

The analysis to be made is necessary to an understanding of the underpinning that gives rise to the duties and obligations of the parties in the swap transactions.

I turn first to the written agreement. The sections in the ISDA Agreement that appear to be relevant to these swap transactions are as follows:

In Section 3.(a)(v), this appears: *"Obligations Binding.* Its obligations under this Agreement ... to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms...."

Section 4., which reads: "Each party agrees with the other that so long as it has or may have any obligation under this Agreement ... to which it is a party: (a) It will deliver to the other party: (ii) any other documents specified in Part 3 of the Schedule or any Confirmation."

Section 9.(d), which reads: "Except as provided in this Agreement, the rights, powers, *remedies,* and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies, and privileges provided by law." (Emphasis added).

Under Section 4., each party must furnish specified information and that information must also relate to any documents specified in any Confirmation. Documents that are referred to in the Confirmation (here I allude specifically to the documents that will enable a party to determine the correlation between the price and yields of the five-year Treasury notes and thirty-year Treasury bonds, the sensitivity tables, the spreadsheets regarding volatility, and documents relating to the yield curve) should be provided.

I turn to the statute law of New York. The Uniform Commercial Code, as part of New York statute law, particularly Section 1–203, states: "Every contract or duty written in this Act imposes an obligation of good faith in its performance or enforcement." New York has also adopted the principles in the *Restatement (Second) Contracts,* § 205, that every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement. *Id.*

■ New York caselaw establishes an implied contractual duty to disclose in business negotiations. Such a duty may arise where 1) a party has superior knowledge of certain information; 2) that information is not readily available to the other party; and 3) the first party knows that the second party is acting on the basis of mistaken knowledge. *Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 57 F.3d 146 (2d Cir.1995). In that case, the U.S. Court of Appeals for the Second Circuit refers to New York cases which establish that implied duty.

Additional cases which explicate the duty to disclose indicate that a duty may arise when one party to a contract has superior knowledge which is not available to both parties. *Young v. Keith,* 112 A.D.2d 625, 492 N.Y.S.2d 489, 490 (N.Y.A.D. 3 Dept.1985); *Haberman v. Greenspan,* 82 Misc.2d 263, 368 N.Y.S.2d 717 (N.Y.Sup.1975). These cases are discussed in *Allen v. West Point–Pepperell, Inc.,* 945 F.2d 40 (2d Cir.1991). Even though a fiduciary duty may not exist between the parties, this duty to disclose can arise independently because of superior knowledge. *See Carvel Corp. v. Diversified Management Group, Inc.,* 930 F.2d 228 (2d Cir.1991) ("Under New York law, every contract contains an implied covenant of good faith and fair dealing." (citing cases)). *See also Unigard Sec. Ins. Co., Inc. v. North River Ins. Co.,* 4 F.3d 1049 (2d Cir.1993) (under New York law, the duty to deal fairly and in good faith requires affirmative action even though not expressly provided for by the agreement. In this case, that affirmative action was the necessity of providing certain notice.).

■ Thus, I conclude that defendants had a duty to disclose material information to plaintiff both before the parties entered into the swap transactions and in their performance, and also a duty to deal fairly and in good faith during the performance of the swap transactions. I confine these conclusions to the parameters outlined in this opinion.

■ One final point must be made. No matter how plaintiff proceeds to prove its case, under New York law the burden of proving fraud requires clear and convincing evidence, and not mere preponderance. *See Almamp Holdings v. Bank Leumi Trust Co. of N.Y.,* 196 A.D.2d 518, 601 N.Y.S.2d 319 (N.Y.App.Div.1993), *lv. denied* 83 N.Y.2d 754, 612 N.Y.S.2d 378, 634 N.E.2d 979 (1994); *Hudson Feather & Down Prods. v. Lancer Clothing Corp.,* 128 A.D.2d 674, 675, 513 N.Y.S.2d 173 (N.Y.App.Div.1987); *Orbit Holding Corp. v. Anthony Hotel Corp.,* 121 A.D.2d 311, 314, 503 N.Y.S.2d 780 (N.Y.App. Div.1986). This evidentiary standard demands "a high order of proof" (*George Backer Mgmt. Corp. v. Acme Quilting Co.,* 46 N.Y.2d 211, 220, 413 N.Y.S.2d 135, 385 N.E.2d 1062 (1978)) and forbids the awarding of relief "'whenever the evidence is loose, equivocal or contradictory'".

## IX. Negligent Misrepresentation and Negligence (Counts III and V)

■ BT also moves for summary judgment as to P & G's claims of negligent misrepresentation and negligence. Reference to New York caselaw demonstrates that these claimed causes of action are not available to P & G.

A line of New York cases holds:

Under New York law, there is no cause of action for negligent misrepresentation in the absence of a special relationship of trust of confidence between the parties. Neither an ordinary contractual relationship nor a banking relationship, without more, is sufficient to establish a "special relationship," which only occurs in the context of a previous or continuing relationship between the parties.

*Banque Arabe et Internationale D'Investissement v. Maryland National Bank,* 819 F.Supp. 1282, 1292–93 (S.D.N.Y.1993), *aff'd* 57 F.3d 146 (2d Cir.1995) (citations omitted). In this case, the court found no "special relationship" between two "sophisticated financial institutions that came together solely to engage in an arm's length transaction." *Id.* at 1293; *Banco Español de Credito v. Security Pacific Nat'l Bank,* 763 F.Supp. 36, 45 (S.D.N.Y.1991) ("In the case of arm's length transactions between large financial institutions, no fiduciary relationship exists unless one was created in the agreement.").

BT and P & G are sophisticated corporations whose dealings were on a business level. Theirs was not a "special relationship" that would support a claim of negligent misrepresentation under New York law.

In support of its negligence claim, P & G urges application of the malpractice provision of *Restatement (Second) Torts,* § 299A, which states:

Unless he represents that he has greater or less skill or knowledge, one who undertakes to render services in the practice of a profession or trade is required to exercise the skill and knowledge normally possessed by members of that profession or trade in good standing in similar communities.

Courts in New York have rarely applied § 299A. *See Heine v. Newman, Tannenbaum, Helpern, Syracuse & Hirschtritt,* 856 F.Supp. 190, 195 (S.D.N.Y.1994) (attorney malpractice); *Roizen v. Marder's Nurseries, Inc.,* 161 Misc.2d 689, 615 N.Y.S.2d 235 (Sup. Ct.1994) (motion to dismiss claim of tree surgeon malpractice denied).

I decline to apply § 299A to this action; rather, the duties and obligations of BT are stated in Section VIII above.

P & G also relies on *Brown v. Stinson,* 821 F.Supp. 910 (S.D.N.Y.1993), where the court allowed a claim of negligent execution of a transaction. The court stated, "Having made such a proposal [to execute a transaction on plaintiff's behalf], defendant undertook the duty to act with due care." This case is distinguished because it involved a non-contractual, gratuitous relationship. The rights and duties of P & G and BT, on the other

**1292**

hand, are based in contract. Where the parties' relationship is contractual, and the duty of good faith and fair dealing is implied in the contract, a negligence claim is redundant.

Thus, summary judgment in favor of BT is granted on Counts III and V.

## X. Conclusion

To summarize these rulings, I grant dismissal under Fed.R.Civ.P. 12(b)6 as to Counts VII—XV, and summary judgment as to Counts III, IV, and V.

But these rulings should not be misinterpreted. While they are required by the case management rules of civil procedure, plaintiff's case will proceed to trial.

The rulings have, in part, been made necessary because of the position of the litigants as parties.

In this case, BT claims that P & G owes it over $200 million and refuses to pay. P & G says that it owes nothing because it was defrauded. Ordinarily one would expect the BT defendants to be party plaintiffs and P & G to be a party defendant. This unusual posture of the parties has caused some confusion which, it is hoped, these rulings will dispel.

Put another way, one would expect BT to sue and P & G to defend because of the alleged fraud. Thus, a verdict in favor of BT as plaintiffs would require payment by P & G; while a verdict for P & G as defendant would mean that it would owe nothing to BT.

Jury instructions will hopefully clarify this for the jury.

IT IS SO ORDERED.